404 U.S. 898
 92 S.Ct. 204
 30 L.Ed.2d 175
 DUN & BRADSTREET, INC.,
v.
C. R. GROVE, Trustee, et al.
 No. 71-206.
 Supreme Court of the United States
 October 19, 1971
 
 On petition for writ of certiorari to the United States Court of Appeals for the Third Circuit.
 The petition for writ of certiorari is denied.
 Mr. Justice DOUGLAS, dissenting.
 
 
 1
 The petitioner, Dun & Bradstreet, Inc., publishes credit reports available by private subscription. Because Altoona Clay Products, Inc., was a sizable concern it became a subject of analysis by the petitioner. From time to time the petitioner issued confidential financial studies of Altoona which were requested by the subject's creditors and suppliers.
 
 
 2
 In early 's, employees discovered in the judgment index of Blair County, Pennsylvania, an unsatisfied entry of $60,000 against Altoona Clay Products Company, a predecessor and defunct enterprise which had been operated by those controlling the subject. On January 3, 1963, the petitioner issued an analysis concerning Altoona, noting this find, but failing to state that the unpaid judgment was against an entirely different firm, at least technically, so that its creditors and suppliers were led to believe that the outstanding liability was owed by Altoona. The error was retracted by Dun & Bradstreet, Inc., in April, 1963, but the respondent, a trustee in bankruptcy presiding over Altoona's estate, claims that the financial demise of its ward was worked during the interim misunderstanding.
 
 
 3
 After protracted litigation initiated in the District Court on diversity jurisdiction, involving a prior appeal and remand, a jury, applying Pennsylvania libel law, awarded $110,000 in 'general damages' to the trustee in bankruptcy. No special damages were found. The District Court, however, entered a judgment n. o. v. in favor of Dun & Bradstreet, Inc., on the ground that New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), proscribed libel judgments under such circumstances of innocent error.
 
 
 4
 The respondent appealed this order to the Third Circuit Which reversed, reinstating the verdict and holding that 'the doctrine of New York Times Co. v. Sullivan does not extend to private credit reports, and that any allegations of defamation concerning such reports are properly subject to the libel laws of the several states.' The opinion issued by the Third Circuit distinguished New York Times on three grounds: (a) unlike Sullivan, the subject of these private reports, Altoona, had no access to the same medium to correct the error; (b) unlike the civil rights struggle, the confidential nature of these nonpublic reports fell outside the realm of public debate; and (c) unlike New York Times, the dispute here was factual in nature, not a difference of opinion. Grove v. Dun & Bradstreet, Inc., 438 F.2d 433 (CA 3 1971).
 
 
 5
 I would grant certiorari and hear argument on the question whether we should reverse the Third Circuit's holding, not because it misreads the New York Times case, but because libel and slander awards are no longer constitutionally permissible elements of American law.
 
 
 6
 It is clear that the First Amendment would proscribe any attempt to enact a federal libel law, notwithstanding the Alien and Sedition Act (1 Stat. 596) the contrary.[1] I do not suppose that anyone considered at the time of its adoption whether the Fourteenth Amendment meant that state courts could no longer participate in libel and slander awards. But I have expressed the idea before that 'constitutional law is not frozen as of a particular moment of time.' Rosenblatt v. Baer, 383 U.S. 75, 90, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). Thus, after it was settled in Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), that the Fourteenth Amendment incorporated the First's freedoms of expression, it followed, in my view, that state libel laws were displaced by the same prohibition that had forbidden federal libel laws.
 
 
 7
 Accordingly, it is difficult to see how it is within our province to hold that both intentional and reckless falsehoods are outside constitutionally protected discussion. That question has been decided to the contrary by constitutional draftsmen believing that even false statements perform an important function. Whether intentional, whether false, all opinions and allegations in this foresic community are catalytic elements which tend to cause us to react, to rethink, and to reply. And even if deliberate untruths were unworthy of protection, it would be counterproductive, as Madison warned, enunciating his views on the Sedition Act, to attempt to adjudicate which were true and which were not:
 
 
 8
 'Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwork of their liberty which the Government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind than the liberty of the press. That this liberty is often carried to excess; that it has sometimes degenerated into licentiousness, is seen and lamented, but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn. However desirable those measures might be which might correct without enslaving the press, they have never yet been devised in America.' VI Writings of James Madison, 1790-1802, at 336 (Hunt. ed. 1906).
 
 
 9
 Thus under our system the libeled may rebut their accusers and presumably those who care about the debate will listen; but repair to the courts for damages no longer is constitutionally permissible.
 
 
 10
 The wisdom of an absolute prohibition against libel recoveries has been demonstrated by the subsequent experience with the rule announced in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710 (1964). Although the common law of libel had fallen into relative disuse, it was revived by the Civil Rights Movement of the last decade which generated heated accusations and, in turn, resort by the defamed to sympathetic state courts to penalize with spectacular awards 'outside agitators' who had published criticisms. In the New York Times case, the plaintiff obtained a half million dollar judgment from an Alabama jury against the New York Times which had published an advertisement in support of civil rights workers in Alabama, which seemed to be critical of Sullivan. Thus for the first time after it had become clear that First Amendment freedoms were incorporated into the Fourteenth, this Court considered the extent to which awarding libel damages had to yield to the protection of a free press.[2]
 
 
 11
 Mr. Justice Black, in my view, correctly stated that 'the minimum guarantee of the First Amendment' is that the press has an 'unconditional right to say what (it) pleases about public affairs.' Id., 297, 84 S.Ct. 735 (emphasis added). The majority, however, felt it necessary to 'balance' the state interests underlying libel awards against the countervailing constitutional values of free expression, producing an actual malice test to be applied where public officials were criticized. Id., 283, 84 S.Ct. 727. I have continually reiterated my agreement with Justice Black, but, even if a balancing approach were appropriate, I also believe that the seven years since New York Times demonstrate that an improper balance was struck.
 
 
 12
 There is a strong argument that the reasons which led the New York Times majority to reject broader liability of publishers a fortiori should also have compelled absolute immunity for defamatory comment. If the common law tests had been too elusive to protect First Amendment interests then the actual malice test has proved neither to be more precise nor to be a better guardian. Proof of knowledge that a statement is false requires slippery proof of a mental state, as does a showing of reckless disregard. Seldom is evidence clear on these issues and a local jury asked to 'weigh all the circumstances' can continue under this evanescent test to penalize unpopular speech. The formula is not made stronger by placing the burden of proof on the plaintiff or by requiring 'convincing clarity' in the degree of proof. These haunting defects have been implicitly recognized on at least ten recent occasions, including the New York Times case, wherein majorities declined to remand for further jury proceedings but instead in each case examined the record, weighed the evidence, found it insufficient, and absolved the publisher.[3]
 
 
 13
 Moreover, the rationale for permitting even limited liability seems dubious. The actual malice standard, it is said, permits liability because 'calculated falsehoods' are not constitutionally protected. Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). But as mentioned earlier even untrue remarks may have positive effects upon the quality of our re-examination process. Moreover, if the rough and tumble of debate is the best vehicle for producing approximations of factual truth or preferred opinion, then courts have no business making premature and interim evaluations of contested statements' merits.
 
 
 14
 Finally, a factor which the New York Times majority failed to gauge properly was the interest of judicial administration in avoiding continuing readjustment of constitutional doctrine. On 16 occasions since and including that case this Court has attempted to clarify the appropriate balance from circumstance to circumstance.[4] The narrow focus on 'public officials'[5] broadened to include 'public figures'[6] and most recently has been expanded to statements of 'general or public interest.'[7] The latter, more blurred focus, as Justices Harlan, Marshall, and Stewart recently observed, will further require this Court to poll itself with increasing regularity to determine what events are of sufficient general or public interest to deserve protection. Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 62, 81, 91 S.Ct. 1811 (1971). Thus in Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), an obscure family's captivity by escaped convicts propelled them into the 'public spotlight' and similarly in Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811 (1971), a majority felt that an arrest of a magazine salesman was sufficiently 'public' to endow a radio station with greater protection for an erroneous newscast that his arrest had been for selling obscene material. It is evident that this ad hoc approach has backed the Court into the same subjective quagmire which has trapped the judiciary in the obscenity cases.
 
 
 15
 Decisions subsequent to New York Times[8] have both tightened the actual malice test and expanded its displacement of the common law. The logical extension of these decisions should in time eliminate entirely libel and slander recoveries from American jurisprudence.
 
 
 16
 I am unpersuaded by the notion that because the petitioner's publications were commercial in nature they deserved less or no First Amendment protection. It is true that Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), held that business advertisements and commercial matters fell outside sanctioned expression, but as I suggested in Cammarano v. United States, 358 U.S. 498, 513-515, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959), that holding was ill-conceived and has not weathered subsequent scrutiny. Only two years after Valentine we held that a municipality could not apply its flat license tax to an evangelist who earned his livelihood by selling religious tracts door to door. Similarly, Burstyn Inc. v. Wilson, 343 U.S. 495, 499, 72 S.Ct. 777, 96 L.Ed. 1098 (1952), disposed of the view that because cinemas were profit enterprises their films were somehow deprived of full First Amendment status. And, in the field of libel we were unanimous in the New York Times case in rejecting the argument that because defamatory comment had been printed as an advertisement for profit it was less deserving of protection. New York Times Co. v. Sullivan, 376 U.S. 254, 265-266, 84 S.Ct. 710 (1964). Surely we have eroded Valentine to the extent that it held a commercial form of publication negated the applicability of the First Amendment. Nor, in my view, should commercial content be controlling. The language of the First Amendment does not except speech directed at private economic decisionmaking. Certainly such speech could not be regarded as less important than political expression. When immersed in a free flow of commercial information, private sector decisionmaking is at least as effective an institution as are our various governments in furthering the social interest in obtaining the best general allocation of resources.[9] Baumol, Economic Theory and Operations Analysis, 249-256 (1961); Braff, Microeconomic Analysis, 259-276 (1969); Dorfman, Prices and Markets, 128-136 (3d ed. 1967).
 
 
 17
 The financial data circulated by Dun & Bradstreet, Inc., are part of the fabric of national commercial communication. There is no doubt that an adverse credit rating can injure a subject. But one injured can inform his suppliers and creditors that a report is misleading. Indeed, in this case, Dun & Bradstreet, Inc., was willing to print a retraction. It is difficult to credit the claim that the 'general damages' suffered by the respondent resulted from the short-term confusion between the mispublication and the retraction. In any event, in my view, it has been predetermined that such speculative costs of unfettered communication are preferable to the chill upon free expression that libel laws impose.
 
 
 18
 I would grant certiorari and set the case for oral argument.
 
 
 
 [1]
 Of the constitutionality of the Sedition Act of 1798, Mr. Justice Holmes said, 'I wholly disagree with the argument of the Government that the First Amendment left the common law as to seditious libel in force. History seems to me against the notion. I had conceived that the United States through many years had shown its repentance for the Sedition Act of 1798, by repaying fines that it imposed.' Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (dissenting opinion).
 
 
 [2]
 The issue presented in New York Times had also been considered by the Court in Schenectady Union Publishing Co. v. Sweeney, 316 U.S. 642, 62 S.Ct. 1031, 86 L.Ed. 1727 (1942) (equally divided vote).
 
 
 [3]
 Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); Monitor Patriot Co. v. Roy, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); New York Times Co. v. Sullivan, 376 U.S. 255, 84 S.Ct. 710 (1964); see also Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), which relied on New York Times to invalidate a criminal libel statute, thereby precluding a jury retrial. That the actual malice test provides inadequate protection against whimsical juries has been pointed out by four Justices. See Linn v. United Plant Guard Workers, 383 U.S. 53, 70-71, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (Justice Fortas); New York Times Co. v. Sullivan, 376 U.S. 254, 293, 297-298, 84 S.Ct. 710 (1964) (Justices Black and Goldberg); Garrison v. Louisiana, 379 U.S. 64, 81, 85 S.Ct. 209 (1964) (this writer).
 
 
 [4]
 In addition to the citations in n. 3, see Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971); Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Curtis Publishing Co. v. Butts, 388 U.S. 930, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534 (1967); Linn v. United Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657 (1966); Henry v. Collins, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965).
 
 
 [5]
 New York Times Co. v. Sullivan, 376 U.S. 255, 84 S.Ct. 710 (1964).
 
 
 [6]
 Curtis Publishing Co. v. Butts, 388 U.S. 930, 87 S.Ct. 1975 (1967).
 
 
 [7]
 Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 43, 91 S.Ct. 1811 (1971).
 
 
 [8]
 It is evident that the transition from 'public official' to 'public figure' to 'events of public or general interest' has substantially broadened the instances in which the actual malice test is applicable. At the same time the actual malice test has been tightened by virtually eliminating reckless disregard as a component. The Court in Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 83-85, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967), defined 'reckless disregard' to mean a 'high degree of awareness of probable falsity.' But even though the Court in the abstract has gone far toward eliminating libel, in practice, juries remain able to justify libel penalties under the nebulous 'actual malice' test.
 
 
 [9]
 Presumably the credit reports published by the petitioner faciltate through the price system the improvement of human welfare at least as much as did the underlying disagreement in our most recent libel opinion, Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811 (1971), arising out of a squabble over whether a vendor had sold obscene magazines.