**Morris D. OBERMAN, Plaintiff-Appellant,**

v.

**DUN & BRADSTREET, INC., Defendant-Appellee.**

**No. 18639.**

United States Court of Appeals,
Seventh Circuit.

April 5, 1972.

Rehearing Denied June 26, 1972.

Elmer Gertz, Chicago, Ill., for plaintiff-appellant.

Don H. Reuben, Chicago, Ill., for defendant-appellee.

Before HASTINGS, Senior Circuit Judge, and KILEY and FAIRCHILD, Circuit Judges.

KILEY, Circuit Judge.

This is a diversity libel suit brought by Oberman alleging that he was injured in his reputation and business by a false and defamatory credit report issued by Dun & Bradstreet, Inc. The district court gave summary judgment for Dun & Bradstreet. We reverse and remand for trial.

Oberman was publisher of *Scrap Age*, a monthly trade magazine for scrap dealers and brokers, steel mills and foundries. The magazine had a circulation of about 2,600. He operated the business as a sole proprietorship. Early in 1967, before he filed this libel suit, he had been negotiating with a real estate broker, The Prudential Realty Company, with respect to the sale or lease of a building in Lincolnwood, Illinois, a suburb of Chicago, into which he could move his business office from Springfield, Illinois.

During the period of negotiations, on August 14, 1967, a credit report on Oberman was requested of Dun & Bradstreet. The report issued February 24, 1967, based upon information gathered by Dun & Bradstreet for a 1966 report. The updated 1967 report contained the following statements, subject of Oberman's libel suit:

On Feb. 24, 1967 Oberman, owner declined statement. Investigation indicates the following condition:

| | |
|---|---|
| Cash | $ 1,000 |
| Accts Rec | 5,000 |
| Fixt & Equip | 15,000 |

Accounts payable not disclosed. Annual sales $150,000.

Sources consulted said volume is concurrently steady with a profit earned. Further details could not be learned and the financial condition is not clear.

Cash confirmed. Non-borrowing account. Balances average low four figures, relations satisfactory.

Following publication of the alleged libel, Oberman complained about the report's inaccuracies and met with Dun & Bradstreet's representative, but refused to give any information to correct the "false" statements.

The suit before us followed. Oberman alleged that the Dun & Bradstreet report greatly understated and misstated his financial condition, falsely impugned his credit as a businessman, and caused Prudential Realty Company to refuse to sell or lease the Lincolnwood property to him.

Defendant's motion for summary judgment relied upon New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), for constitutional protection of its "right to publish the report" with impunity against Oberman's claim, and asserted the absence of any genuine issue of material fact. The district court granted summary judgment on the ground that the Dun & Bradstreet report was conditionally privileged and that under the *New York Times* doctrine Dun & Bradstreet was not liable, absent proof of "actual malice."

The questions on appeal are: 1) whether the district court erred as a matter of law in applying the federal *New York Times* "actual malice" rule in this diversity case; 2) whether the pleadings, affidavits and depositions presented a genuine issue of material fact as to Dun & Bradstreet's alleged abuse of conditional privilege; 3) whether the report was libelous per se; and 4) whether there was a genuine issue of material fact as to Oberman's claimed special damages.

## I.

Implicit in these contentions is the issue whether the rule of New York

Times Co. v. Sullivan and other federal cases, or the Illinois libel law is applicable. We hold that the federal law is not applicable and that Illinois law applies to this diversity action.[1]

Both parties speak of the "emerging constitutional standards" growing out of the New York Times decision and its progeny, a series of cases in which "the Court has considered the limitations upon state libel laws imposed by the constitutional guarantees of freedom of speech and of the press." Rosenbloom v. Metromedia, Inc., 403 U.S. 30, 91 S.Ct. 1811, 1813, 29 L.Ed.2d 296 (1971). The Court in New York Times held "that the constitution delimits a state's power to award damages for libel in actions brought by public officials against critics of their official conduct." 376 U.S. at 283, 84 S.Ct. at 727. The Court held, "The constitutional guarantees require, we think, the federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–280, 84 S.Ct. at 726. A number of cases decided after New York Times "involved actions of 'public officials' or 'public figures'. . . . Common to all the cases was a defamatory falsehood in the report of an event of 'public or general interest.'" Rosenbloom, 403 U.S. at 30, 91 S.Ct. at 1813. Before the Rosenbloom decision, in Time, Inc. v. Hill, 385 U.S. 374, 390–391, 87 S.Ct. 534, 17 L.Ed.2d 456 (1964), the Court expressly reserved the question whether the New York Times actual malice test, "of knowing or reckless falsehood," applied in a libel action brought by a private individual. Then in Rosenbloom the question arose whether the New York Times test of actual malice applies in a state civil libel action "by a private individual for a defamatory falsehood uttered in a news broadcast by a radio station about the individual's involvement in an event of public or general interest." 403 U.S. pp. 31–32, 91 S.Ct. p. 1814. The Court held that the New York Times standard applied.

There, however, Rosenbloom conceded "that the police campaign to enforce the obscenity laws was an issue of public interest. . . . " p. 40, 91 S.Ct. p. 1818. The Supreme Court reasoned that a community has a "vital interest" both in the proper enforcement of obscenity laws and in "assuring that the law is not used unconstitutionally to suppress free expression." p. 43, 91 S.Ct. p. 1819. The Court thought that whether the person defamed was a private person or public official was irrelevant in ascertaining whether the public has an interest in the particular issue. The Court concluded that to sustain his action Rosenbloom had to present "clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not." p. 52, 91 S.Ct. p. 1824.

Since the time of Rosenbloom, therefore, applicability of the federal rule focuses, not upon whether the plaintiff is a public official, but upon whether the publication is of an event of "public or general interest." The Court in Rosenbloom noted, at p. 45, 91 S.Ct. 1811, that it adhered to the caution expressed in Time, Inc. v. Hill, 385 U.S. p. 390, 87 S.Ct. 534, against "blind application of the New York Times standard. The Court has not yet extended the New York Times test to a person like Oberman vis-a-vis a publication like the Dun & Bradstreet credit report. See 403 U.S. n. 17, p. 49, 91 S.Ct. 1811, Rosenbloom.

Dun & Bradstreet argues that credit ratings are so important in our society that the public policy shown in the Su-

1384

preme Court cases favors affording them First Amendment protection against libel suits. We are not persuaded that the credit rating of Oberman's business was entitled to the same treatment that the Supreme Court has afforded newspapers and magazines, but, assuming *arguendo* that the credit rating was entitled to that protection, we fail to see how giving the protection in this case brought by a private person upon a matter not of public interest can be justified. Although in *Rosenbloom* the plaintiff was, like Oberman, a non-public person, the radio broadcast, subject of the *Rosenbloom* suit, was a matter of "public interest and concern." We cannot see, however, that Oberman's financial affairs could be of any interest to any persons other than the few involved in his intended purchase or lease of the Prudential property, or those to whom he looks for credit in his business, or those whom his trade paper reaches.

Dun & Bradstreet has been the target of several libel suits in more or less recent times. The district judge's oral findings and conclusions before us placed primary reliance upon Grove (Trustee and Altoona Clay Products, Inc.) v. Dun & Bradstreet, Inc., 308 F. Supp. 1068 (W.D.Pa.1970), a Pennsylvania diversity libel case, and found the cases, where Dun & Bradstreet was held libel, to be unconvincing.[2]

The district court in *Grove and Altoona Products*—noting the privilege awarded Dun & Bradstreet credit reports—cited King v. Patterson, 49 N.J. L. 417, 9 A. 705, 712 (1887), to support its view that a commercial report had "a public interest," applied the *New York Times* "actual malice" rule and dis-

missed the complaint. The court decided that although Altoona Products "was known only to a limited public," the credit report had a "public interest," and the *New York Times* "actual malice" rule was applicable. However, on appeal in the *Altoona Products* case, sub nom. Grove v. Dun & Bradstreet, Inc., 438 F.2d 433 (3rd Cir. 1971), the Third Circuit reversed, holding that Altoona Products was not "a public figure" within the *New York Times* rule. p. 436. The court found no case which supported the view that "a small brick and tile brokerage firm" was subject to the "rigorous standard" of *New York Times*. The court further found that the Dun & Bradstreet credit report was not "a medium entitled to [the] extended constitutional protection" of the *Times* doctrine. p. 437. The credit report, thought the court, did not publish news for public consumption and was by its own terms confidential; and the firm did not have access to it. It was not entitled to broad constitutional protection, the court continued, "for the more pernicious reason that the source or nature of the assertions may never be exposed." The report was not "opinion, comment, or criticism" but was factual, and not subject to "freedom of discussion" about its contents.[3]

In the case before us Dun & Bradstreet relies upon Dun & Bradstreet, Inc. v. O'Neil, 456 S.W.2d 896 (Tex.1970), where the court applied the *New York Times* doctrine. However, the Supreme Court of Texas had, prior to the *O'Neil* decision, adopted the *Times* doctrine in El Paso Times, Inc. v. Trexler, 447 S.W.2d 403 (1969). There was no question in *O'Neil*, as here,

2. The judge noted that the Supreme Court had left open the question whether the *New York Times* doctrine should be applied on the "particular question" in this case.

   The judge also could "not see" that Oberman should be able to collect for "negligent . . . misstatement of information" to which he was "privy" where he refused to cooperate in correcting the

misinformation. We think Oberman's refusal to cooperate is irrelevant to the question discussed in this part of our opinion.

3. The Supreme Court, Douglas, J. dissenting, denied certiorari, 404 U.S. 898, 92 S.Ct. 204, 30 L.Ed.2d 175 (October 19, 1971). *See also* Kansas Electric Supply Co. v. Dun & Bradstreet, Inc., 448 F.2d 647 (10th Cir. 1971).

whether to apply the state's less rigorous rule.[4]

## II.

Under Illinois law Dun & Bradstreet may be liable if the concededly qualified or conditional privilege was abused. Zeinfeld v. Hayes Freight Lines, Inc., 41 Ill.2d 345, 350, 243 N.E. 2d 217, 221 (1968). And the privilege is abused if the publisher does not believe in the truth of the defamatory matter, or has no reasonable grounds for believing it to be true, *id.*, a fact which may be inferred from "[a]ll circumstances surrounding the transaction . . . , including the failure to make a proper investigation," Cook v. East Shore Newspapers, 327 Ill.App. 559, 590, 64 N.E.2d 751, 765 (1946), or "from falsity, absence of proper cause or other relative circumstances or . . . from the libel itself." Van Norman v. Peoria Journal-Star, Inc., 31 Ill.App.2d 314, 327, 175 N.E.2d 805, 811 (1961). The precise question before us now is whether there is a genuine issue of material fact as to whether Dun & Bradstreet abused its conditional privilege.

There is evidence in depositions read in the district court that the information upon which the Oberman credit report of February, 1967 was based was taken from a 1966 report of financial data gathered by Dun & Bradstreet beginning "many years ago" from an unknown source; that the information on plaintiff's business had been updated annually; that Dun & Bradstreet's representative Fogelman in bringing the record up to date from 1966 to 1967 merely requested, in February 1966, information from Oberman which was denied; that Fogelman next saw Oberman in August 1967, after issuance of the 1967 credit report, following a complaint by Oberman; that before issuance of the credit report Fogelman reviewed the 1966 report and saw "no physical changes" in Oberman's office in Springfield, even though the office building was two-story and he had reported it as one-story; that he sought no information from Oberman's accountant or from banks; that he took the $150,000 annual sales figure and the $1,000 cash figure in the 1967 report from the "previous report;" and that no one but Fogelman had responsibility of getting information for the February 1967 credit report.

We think this testimony, if believed by the trier of fact, would justify an inference that Dun & Bradstreet failed "to make a proper investigation" under Illinois law on a genuine issue of material fact.

## III.

We are not persuaded by Oberman that the credit report before us is libelous per se. We cannot agree that the credit report about his business is "so obviously and inevitably hurtful to the plaintiff that damage to his reputation may be presumed." Zeinfeld v. Hayes Freight Lines, Inc., 41 Ill.2d 345, 348, 243 N.E.2d 217, 220 (1968). The letter in *Zeinfeld,* "stripped of innuendo," was held to be libelous per se. *Id.* But the court there was "convinced" the letter construed under the innocent construction rule charged a criminal offense. *Id.* And under this court's decision in Continental Nut Co. v. Robert L. Berner Co., 345 F.2d 395 (7th Cir. 1965), the credit report before us would have to charge "directly" Oberman's "financial instability." p. 398. We conclude that the credit report is not libelous per se.

---

4. Although the Illinois decisions cited hereinafter use the term "actual malice," the meaning given the term is different from the definition of the term in the *New York Times* decision. The Illinois cases clearly use the term to mean " 'a positive desire and intention to annoy or injure another person,' " John v. Tribune Co., 28 Ill.App.2d 300, 316, 171 N.E.2d 432, 441 (1961), and "malice in fact"—"a wrongful act done intentionally without just cause or excuse." Van Norman v. Peoria Journal-Star, Inc., 31 Ill.App.2d 314, 327, 175 N.E.2d 805, 810–811 (1961).

## IV.

Finally, the question is whether there is a genuine issue of material fact that the alleged libel caused "special damages." We think there is such an issue.

Oberman's complaint alleges that as a result of the credit report received by Prudential Realty, Prudential broke off negotiations with him, refused to lease the Lincolnwood building which he was in financial condition to assume, and left him no place in which to conduct his business.

There is evidence of negotiation between Oberman and Prudential during several weeks in August 1967. Oberman discussed with Prudential his location needs and was shown the building. They also discussed Oberman's credit, and terms of a proposed contract and mortgage. There is evidence that Oberman was told by Prudential the deal was off because of an adverse credit report, and that the credit report was requested by a Skokie, Illinois bank—of which a Prudential vice-president was director —a prospective mortgagee. There is also testimony that Oberman was told by Prudential that the reason the deal was off was that the building was sold and leased and off the market during a period of hesitation on Oberman's part as to whether to buy or lease it.

There is in the record an affidavit of Unger, the buyer of the building, that he bought it and had it removed from the market August 10. The record shows, however, a written sale agreement dated September 11. Dun & Bradstreet claims it is undisputed that the credit report was not received until August 14, and that accordingly it could not have caused the sale to Unger. However, two of Prudential's officers deposed that they first met with Oberman on August 9 and that the negotiations with him took place over the following two to five weeks. And according to Oberman's deposition, Rance, of Prudential, told him that the sale to Unger was made because of the adverse credit report on Oberman.

We think there is a genuine issue of material fact as to when the sale occurred—August 10 or September 11. If the latter—as the testimony of continuing negotiations after August 10 indicates—the credit report could have been the reason for not concluding a lease or sale with Oberman. Resolution of this issue involves credibility determinations for a trier of fact.

We are not persuaded that a trial of the issues—whether there was an abuse of Dun & Bradstreet's privilege and whether and to what extent Oberman was injured—would be "useless" or require a directed verdict for Dun & Bradstreet, under this court's decision in Kirk v. Home Indemnity Co., 431 F. 2d 554, 559 (7th Cir. 1970).

---

For the reasons given, the judgment is reversed and the cause is remanded for trial pursuant to the views expressed in this opinion.

HASTINGS, Senior Circuit Judge (dissenting).

Plaintiff Oberman seeks recovery of $500,000 general damages against defendant Dun & Bradstreet, Inc., in each of two counts of his complaint based upon his claim of libel from a commercial credit report issued by defendant. The material portions of the credit report are set out in the majority opinion.

Plaintiff alleges in substance that the credit report was false in that it understated his assets and financial condition, and that defendant was negligent in preparing the report. His sole claim of damage arises from the assertion that he was unable to purchase or lease a commercial building in Lincolnwood, Illinois for his magazine publishing business by reason of this report.

Plaintiff publishes a monthly trade magazine, Scrap Age, with an approximate circulation of 2,600 copies. He does

not own a printing plant but engages an independent job printer in Indiana to print his magazine. At the time of the suit his office was in Springfield, Illinois, and he had 15 employees.

Before suit Oberman had been negotiating with a real estate broker in Lincolnwood. The Prudential Realty Company, in response to its newspaper advertising, for a business location. Oberman first came to Prudential in July or early August, 1967. He was shown a drawing of a building then under construction on Hamlin Avenue in Lincolnwood. He inquired of Rance, president of Prudential, whether Prudential could assist in arranging for a purchase mortgage if he decided to purchase the building rather than lease it. Rance advised him he could inquire at a local bank where one of Prudential's salesmen (Schoeneberger) was a director, but told him that if he wanted a mortgage he should submit his financial statements for the last three years. Oberman replied that he would rather not furnish financial statements, saying "I believe if you check my record you will find it good."

Defendant issued its credit report in question on February 24, 1967. It was prepared by defendant's reporter Fogelman. It had been reviewed and updated from year to year as best it could be done without Oberman's cooperation. In 1966 and 1967 Fogelman made three personal calls on Oberman and one telephone call in an attempt to obtain credit report information. On each occasion Oberman flatly refused to furnish any facts or data to Dun & Bradstreet, Inc. pursuant to his own fixed policy.

Finally, when Oberman called defendant to complain about his credit report Fogelman arranged to call on him. Fogelman saw Oberman at the latter's office the next day and gave him a copy of the February 24, 1967 report. This was the first time Oberman had ever seen the report. He questioned the accuracy of almost everything in the report, but in reply to Fogelman's repeated requests Oberman still refused to give any information. A careful reading of Oberman's

deposition confirms the foregoing statements. In fact, the following colloquy appears between Oberman and defendant's counsel:

Q. Right, and so the statement on the face of that report that the owner declined to give information is correct, isn't it, Mr. Oberman?

A. "On February 24th Mr. Oberman declined to give a statement." [obviously, Oberman paraphrasing the report]

Q. So you did have this firm and unswerving policy of not giving any information to Dun & Bradstreet?

A. That is correct, I never did, and I have been in business more than thirty years and I have never given them an inch.

The deposition continues in detail to show that Oberman refused to give any information to correct Dun & Bradstreet's February 24 report although it expressed a desire to send out a corrected report if there were errors.

The February 24 report does not assign a credit rating classification to Oberman but contains what is known as a "blank rating." Defendant's customers are advised that this indicates the owner declined to give information and no rating could be assigned. Subscribers are further directed they should seek information about the subject from other sources.

Prudential is not a subscriber of Dun & Bradstreet and defendant did not send them a report on Oberman. Schoeneberger requested The First National Bank of Skokie, Illinois, where he was a director while employed as a Prudential salesman, to order a Dun & Bradstreet report on Oberman after Oberman had expressed interest in obtaining a purchase mortgage. *It is undisputed that defendant's February 24 report was not mailed to the Skokie bank until August 14, 1967.*

However, it is equally clear and undisputed that the Hamlin Avenue building was sold to another buyer before anyone at Prudential Realty saw or

learned of Dun & Bradstreet's February 24 report on Oberman. *On August 10, 1967,* four days before the report was mailed to the Skokie bank, the Hamlin Avenue building was sold to a Mr. Dan Unger of Chicago for $133,000 and he instructed Rance, of Prudential, to remove it from the lease market. When Oberman next contacted Prudential he was advised of the status of the Hamlin Avenue building. This prompted Oberman to inquire of Rance whether a credit report had been obtained. Rance continued to deal with Oberman in attempting to find him a suitable building.

It thus appears conclusive to me that since the Hamlin Avenue building was sold before the Dun & Bradstreet report was sent to the Skokie bank and since it was never sent to Prudential, the report could have had nothing to do with Oberman's failure to obtain the building, from which failure his sole claim for damages derives.

I agree with the majority that the subject credit report is not libelous *per se.* I would go further in this case and hold under the foregoing factual statement that, as a matter of law, the report is not libelous in any sense of the word. In sum, I would hold as a matter of law that the credit report was privileged, was not published with actual malice, was not libelous *per se* or in any sense and could not have been the cause of plaintiff's alleged damage.

All questions concerning the breadth of the rule in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), I leave to the future consideration of the Supreme Court in light of the illuminating dissent of Mr. Justice Douglas from the denial of a writ of certiorari in Dun & Bradstreet, Inc. v. Grove, 404 U.S. 898, 92 S.Ct. 204, 30 L.Ed.2d 175 (1971). In the case at bar, of course, Dun & Bradstreet was afforded no opportunity to publish a retraction due to Oberman's recalcitrance. However, Mr. Justice Douglas aptly remarked in the concluding paragraph of his *Grove* dissent, at 906, 92 S.Ct. at 209:

"The financial data circulated by Dun & Bradstreet, Inc., are part of the fabric of national commercial communication. There is no doubt that an adverse credit rating can injure a subject. But one injured can inform his suppliers and creditors that a report is misleading. Indeed, in this case, Dun & Bradstreet, Inc., was willing to print a retraction. It is difficult to credit the claim that the 'general damages' suffered by the respondent resulted from the short-term confusion between the mispublication and the retraction. In any event, in my view, it has been predetermined that such speculative costs of unfettered communication are preferable to the chill upon free expression that libel laws impose."

I would affirm the judgment of the district court granting summary judgment in favor of the defendant.