**UNITED STATES of America**

v.

**The CITY OF PALM BEACH GARDENS, a municipal corporation under the laws of the State of Florida, Palm Beach Gardens Community Hospital Corporation, Palm Beach Community Hospital, Inc., American Medical International, Inc., Bernard L. Samson, Frank Bonsey, William B. Wood, William H. Horner, and Robert R. Nelson as Trustees and Distributees of United American Medical Services, Inc., a dissolved corporation.**

No. WPB–76–8372–Civ–NCR.

United States District Court,
S. D. Florida,
West Palm Beach Division.

Jan. 17, 1979.

---

J. V. Eskenazi, U. S. Atty., Asst. U. S. Atty. Don R. Boswell, Miami, Fla., Leland Ware, Asst. Regional Atty., Dept. of Health, Education & Welfare, Atlanta, Ga., for plaintiff.

Brant & Baldwin, Lake Park, Fla., for City of Palm Beach Gardens.

Wood, Lucksinger & Epstein, Houston, Tex., Gunn, Venney & Buhler, Miami, Fla., for all defendants.

## MEMORANDUM OPINION

ROETTGER, District Judge.

The Government has sued to recover a $400,000 grant awarded under the Hill-Burton Act for the construction of a non-profit hospital built in the name of the City of Palm Beach Gardens. 42 U.S.C. § 291i. There is no dispute about the fact that the hospital was conveyed several years ago to a proprietary corporation and has been reconveyed several times since that time.

The only question is whether the Government's claim for recoupment is barred by the 6-year statute of limitations. 28 U.S.C. § 2415(b).

## FINDINGS OF FACT

The City of Palm Beach Gardens was incorporated and received its charter in 1959. The city was basically developed by the late John D. McArthur, who was not only the largest land owner in Palm Beach County but also one of the two or three richest men in the United States. Operating typically as a developer-controlled city, Palm Beach Gardens held no elections for City Councilmen until 1966 at which time the hospital had already been built and was standing idle in a cow pasture. The previous City Councils comprised employees of Bankers Life & Casualty Company (an asset of John McArthur) exclusively, and could be accurately described as developer-Councils. The hospital construction had been financed with a construction loan of approximately $800,000 from Bankers Life & Casualty Company and the Hill-Burton grant in issue. There were about 2,000 people living in Palm Beach Gardens in 1966.

The first Mayor testified that the city conducted feasibility studies about the city's operating the hospital and the reports were negative. In addition, the question of issuing bonds to operate the hospital was put to a straw vote before the citizenry who resoundingly turned it down. As a result the first elected City Council refused to issue the bonds although the predecessor developer-Council had validated them. Finally, doctors refused to staff the facility.

The plight of this small city saddled by an apparently unnecessary hospital is dramatized by the fact that at this time it did not even have a city hall building. For a time the city clerk operated out of the back of a station wagon. Eventually, the city acquired a bottling works building and used it as a city hall. As the Mayor testified, although this situation may seem somewhat amusing now, the hospital was "serious business" to a small town of 2,000 people.

Consequently, the hospital sat idle in the middle of a cow pasture, and the city was burdened with an expensive and useless "white elephant." At the same time HEW was urging city officials to open the hospital, and was threatening to take some action about recoupment if they did not.

Apparently out of desperation and a desire to get the hospital running, the city began negotiating with a group of private individuals about a possible sale. The first city clerk testified that he met with Mr. Arthur W. Forehand, the head of the state Hill-Burton agency that monitors the Hill-Burton hospitals in the State of Florida, to check out the reliability of the potential purchasers. These eventual purchasers are defendants, Bernard L. Samson, William H. Horner, and Frank G. Bonsey (the Samson group). Later on, William B. Wood and Robert R. Nelson joined the group as purchasers. HEW depends on the state Burton-Hill agency to notify it of any conveyance to a proprietary corporation; it apparently never received any such official notification at the time of the first conveyance.

Negotiations began in 1968 for the transfer of the hospital from the city to the Samson group. The contract to sell was executed on July 22, 1968; modified for the first time on September 30, 1968, with a subsequent modification on April 14, 1969. Mr. Forehand testified that he never saw the agreement until July of 1974 although he had asked for it. He said he did not know it had been signed. However, Forehand had received a copy of a newspaper article which mentioned the sale, and on October 9, 1968 he wrote to the city advising it would be liable for recovery of the grant if it sold the hospital. No response was received from the city.

On November 18, 1968 Forehand again wrote the City Manager and asked if there was a new Mayor; again he advised city officials of the possible grant recovery. Once more there was no reply. Forehand testified he notified the Federal government of the proposed sale and that he had asked city officials for information about the sale. However, he also testified that

during this time litigation in process between Palm Beach Gardens and John D. McArthur prevented any action until the litigation was cleared up. When the litigation was finally cleared up, some action in the form of an investigation was taken by the Florida Hill-Burton agency. He came to several meetings of the city during the period 1966 through March 1968 and Mr. Walter P. Hayes of the Atlanta Hill-Burton office was there at least at one other meeting. However, Forehand wrote nothing further between November 1968 and the time of the investigation that the Florida Hill-Burton agency conducted in 1974 because, he said, "I gave up on it." However, he apparently had learned the name of the new Mayor because he did write him during that period of time.

On October 4, 1968 a memo was typed at the Atlanta Regional Office of HEW regarding a telephone request of Mr. Samson for an appointment with Mr. Hayes of the HEW Hill-Burton office in Atalnta concerning the recovery provisions for the Federal share in the hospital. Later that month, Messrs. Samson and Horner visited with Mr. Hayes in Atlanta. They told him they wanted to buy the hospital and pay off the grant in payments extended over a period of time. Hayes advised them they would, instead, have to pay off the grant all at once because they were a proprietary corporation. Samson and Horner asked to read the applicable statute and told Hayes they did not think the grant created a lien on the property and that they did not have to pay it off until the Government filed suit. The Samson group then advised the city officials there was not any lien and apparently the attorneys for the city agreed. As part of the negotiations, the Samson group agreed to indemnify the city if the Federal government ever sued for recoupment and obtained a judgment.

The resulting acquisition made the newspapers in Palm Beach County with a headline that described it as the largest land deal of the year with the smallest down payment. This referred to the consideration paid for the hospital which was the assumption of an $800,000 mortgage, the

$400,000 grant liability, and a small payment of cash. Also, the file of the Hill-Burton section of HEW contained a telephone transcription of a news article regarding possession of the hospital by United American Medical Services, Inc. and that "Samson was buying the hospital." The file also contained various newspaper articles about the status of the hospital. Hayes had written Forehand on October 25, 1968 after Samson and Horner visited him, which apparently acted as the stimulus for Forehand's letter of November 18, 1968 to Mr. Bryan A. Poston, the City Manager of Palm Beach Gardens.

During 1968 the Samson group, who had apparently assigned their rights under the contract to United American Medical Services, Inc., went into the hospital as vendees in possession, spent hundreds of thousands of dollars on repairs, got it ready to open and filed for an original application to participate in the Medicare program on December 12, 1968. The hospital opened on November 15, 1968, with its first patient being admitted on November 18, 1968. The Medicare application was approved on January 30, 1969 and the agreement between the Secretary of HEW and the hospital was backdated to December 12, 1968. On page two of the request to establish eligibility there is an indication that the hospital operating under the name of Palm Beach Gardens Community Hospital, was a proprietary hospital with the ownership in the name of United American Medical Services, Inc. This application was received in the department of HEW which deals with health cost and finance administration, but it is totally separate from the HEW department administering the Hill-Burton program. In fact the hospital administrator didn't know Mr. Hayes or his successor. Annual Medicare cost reports were also filed with that department and each report classified the owner of the hospital as a proprietary corporation. The Medicare program, however, has no interest in whether the hospital is proprietary or non-profit.

On March 16, 1970 a deed was signed conveying the hospital from the City of

Palm Beach Gardens to United American Medical Services, Inc. On October 2, 1970 a second deed was signed conveying the property from United American Medical Services, Inc. to Palm Beach Gardens Community Hospital Corp. Finally, on December 11, 1970 another deed was executed conveying the hospital from Palm Beach Gardens Community Hospital Corp. to Palm Beach Gardens Community Hospital, Inc., both proprietary corporations. The first deed was recorded on March 17, 1970; the second on October 7, 1970; and the third on December 15, 1970.

On November 1, 1970, a plan for Reorganization and Merger Agreement was entered into by American Medical Enterprises, Inc., United American Medical Services, Inc. and Palm Beach Gardens Community Hospital Corporation. Under the terms of that complex agreement, American Medical Enterprises, Inc. was to create a wholly owned subsidiary named P.B.G.C.H., Inc. This was done on December 4, 1970. Then, P.B.G.C.H., Inc., was supposed to merge with Palm Beach Gardens Community Hospital Corporation, which was totally owned by United American Medical Services, Inc. Pursuant to an agreement executed on December 10, 1970, Palm Beach Gardens Community Hospital Corporation and P.B.G.C.H., Inc. did merge, leaving P.B.G.C.H., Inc., as the surviving corporation. P.B.G.C.H., Inc., then changed its name to Palm Beach Gardens Community Hospital, Inc., the present owner of the hospital. Also, as the surviving subsidiary contemplated by the November 1, 1970 agreement, P.B.G.C.H., Inc., became a party to that agreement. At present, it seems that American Medical Enterprises, Inc. has undergone a corporate change, and is survived by American Medical International, Inc. A.M.I. is the 100 percent owner of all stock in Palm Beach Gardens Community Hospital, Inc. On December 9, 1976 the Government filed suit for recoupment.

## CONCLUSIONS OF LAW

This is an action authorized by 42 U.S.C. § 291i for the recovery of funds paid under provisions of that title to an institution which, within twenty years after completion of construction, is sold or transferred to a for-profit entity, and ceases to be a non-profit health care facility or hospital. The jurisdiction of this court is properly invoked under 28 U.S.C. § 1345.

The applicable statute of limitations in cases brought by the United States is 28 U.S.C. § 2415(b). It provides that "an action to recover for diversion of money paid under a grant program . . . may be brought within six years after the right of action accrues." Vital to the determination of this case are the provisions of 28 U.S.C. § 2416(c) which exclude from the computation of the limitations period, "all periods during which facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances."

By the provisions of 42 C.F.R. § 53.134, the Florida Department of Health and Rehabilitative Services was required to inform the Secretary of HEW in writing of any transfer to a non-qualified transferee of any facility receiving funds under the grant program. The questions essential to the resolution of this case are: (1) When did the government's cause of action accrue; (2) what facts could the government have reasonably known about; (3) when could the government be charged with that knowledge; and (4) does a corporate merger cause a "sale or transfer" within the meaning of 42 U.S.C. § 291i and thus trigger a cause of action in favor of the United States?

■ It seems clear that the government's cause of action accrued at the time there was a breach of the conditions attached to the grant. This would occur whenever a transfer was made within twenty years after completion of construction to an institution which was not eligible under the Hill-Burton Act. For purposes of resolving the sole issue of when the cause of action accrued, the court feels that the time of discovery of the cause of action by the government is not material. It is the

breach of a duty owed to plaintiff which gives rise to the cause of action, not discovery of the breach. *Unexcelled Chemical Corp. v. United States*, 345 U.S. 59, 65, 73 S.Ct. 580, 583, 97 L.Ed. 821 (1953). *See also, Jankowitz v. United States*, 533 F.2d 538, 547, 209 Ct.Cl. 489 (1976). Thus the government had a right to sue for recoupment, at the earliest, when the first transfer was made to a for-profit institution.[1] At this time, the government first could have successfully maintained a suit based on that cause of action. *Bell v. Aerodex*, 473 F.2d 869, 873 (5th Cir. 1973).

From the court's findings of fact, it appears that the City entered into a contract to sell the hospital to a group of individuals on July 22, 1968. After several modifications of that agreement, it appears that on March 16, 1970 a warranty deed was signed and recorded the next day, which conveyed the hospital from the City of Palm Beach Gardens to United American Medical Services, Inc., clearly a for-profit corporation. There can be no doubt that at this point, the terms of the grant program had been breached, and a cause of action for recoupment had arisen in the government's favor.

However, the tolling provisions of 28 U.S.C. § 2416(c) do not allow the simple application of the six-year statute of limitations. By its terms, the statute requires the court to determine if there were key facts which the plaintiff neither knew nor could have reasonably known.

Looking at the circumstances existing in Palm Beach Gardens during the times in question, the court concludes the government had ample reason to suspect that the hospital might be sold to a for-profit entity in 1968. And that it had until 1974 to file this lawsuit. It appears that the government did not attempt to monitor the status of the hospital with personal inspection or any other definite method. The court does not conclude that the state Hill-Burton agency, acting as the agent for HEW,

should be held to the rigorous standard of checking deeds at the county courthouse on a regular basis to see if federally funded institutions have changed hands; however, this case is replete with incidents, circumstances, and almost blatant "tips" which should have caused Florida Department of Health and Rehabilitative Services in Tallahassee to investigate and verify that the hospital had changed hands. Although this situation did not involve a Regional Circular which directed a state agent to make a personal visit, the court finds *United States v. City of Leesville*, 389 F.Supp. 943 (W.D. La.1975) persuasive. "A quick trip to [Palm Beach Gardens] would bring the revelation." *Id.* at 945. If the state Hill-Burton agency is to be charged with any responsibility at all, it must surely extend beyond allowing mail and telephone queries to go unanswered and ignored.

Considering the chronology of events testified to at trial, the court notes that HEW was urging the city to begin operating the hospital; that Arthur W. Forehand knew of the potential buyers; that he received newspaper clippings concerning the proposed sale; and that two of the prospective purchasers had even met with Mr. Hayes of HEW in Atlanta. It also appears from the record that during this time, the local media was giving prominent coverage to the possible transaction.

Besides these events, which the court finds should have made HRS reasonably award of the change in status, the hospital started operating under the new group on November 15, 1968. Eventually, the hospital was even approved by HEW as a Medicare facility. This approval took place after the hospital had described itself as a for-profit institution on the application forms, and even subsequently reported itself as proprietary on cost reports.

In view of these events, it is easy to believe Mr. Forehand's admission that, "I

---

1. Defendants claim that plaintiff's cause of action accrued during the two years when the hospital sat idle. The court disagrees. The statute allows for a cause of action when the hospital *ceases* (emphasis added) to be an eligi-

ble institution. If it never operated as an eligible institution, the court does not see how it could later cease to be one. *Compare, Poirrier v. St. James Parish Police Jury*, 372 F.Supp. 1021 (E.D.La.1974).

gave up on it" when his queries to the city and hospital went unanswered. Otherwise, it does not seem possible that the hospital's change in status could go so totally undetected.

 Because it is unnecessary to do so as to defendant city or the Samson group, the court hesitates to single out one particular date or event which marks the accrual date of the cause of action. However, looking at the totality of the circumstances, the court holds that a cause of action for recoupment accrued in favor of the government against those defendants no earlier than July 22, 1968 and no later than March 17, 1970 when the deed was recorded. The court also holds that the government, through its state Hill-Burton agency, could reasonably have known of the key events giving rise to the cause of action, and that the tolling provisions of 28 U.S.C. § 2416(c) do not apply. Consequently, the government's cause of action arising out of the transfer culminated by the March 16 deed was barred by 28 U.S.C. § 2415(b) as of March 17, 1976. Because plaintiff did not file suit until December 9, 1976, its cause of action against these defendants must fail.

 The Secretary and his state agent could certainly be held to the standard of due diligence in monitoring these grant funds. The court agrees with the general proposition that "[f]ailure to know what could have been known in the exercise of due diligence amounts to knowledge in the eyes of the law." *Mungin v. Florida East Coast Railway Co.*, 318 F.Supp. 720 (M.D. Fla.1970), *affirmed* 441 F.2d 728, *cert. denied*, 404 U.S. 897, 92 S.Ct. 203, 30 L.Ed.2d 175. The court also finds that the purchasing group's taking possession of the hospital facility and operating it after November 1968, was certainly sufficient to put a diligent person on notice that those purchasers had acquired rights in the hospital. *See National Indemnity Co. v. Banks*, 376 F.2d 533, 535 (5th Cir. 1967).

Plaintiff also claims that two subsequent transactions trigger new causes of action in its favor, and cite to *United States v. Brady*, 385 F.Supp. 1347 (S.D.Fla.1974) as sup-port. However, the government's reliance on that case is misplaced. In *Brady*, the court imposed liability on subsequent transferees, so that the purpose of the statute could not be frustrated by the simple transfer in and out of a shell corporation. That case did not consider the type of corporate activity which exists here, and it is not dispositive of this case.

Here, the court is faced with the difficult task of determining whether the two subsequent transfers were "sales" or "transfers" within the meaning of 42 U.S.C. § 291i, and whether or not they create new causes of action in the government's favor. The resolution of this issue is crucial to the outcome of the case. If no new cause of action was triggered, then the government is barred and judgment must be entered in favor of the remaining defendants. If, however, these two transfers do trigger new causes of action, then it appears that the transferor and transferee involved in the December 11, 1970 transfer would be liable to the government.

To dispose of this question, the court must look closely at the language of 42 U.S.C. § 291i, and carefully examine the results of those two later transactions.

 The language of the statute in question indicates that a cause of action shall accrue in the government's favor. "If any facility with respect to which funds have been paid . . . shall, at any time within twenty years after the completion of construction (a) be sold or transferred to any [non-qualified entity]." When a statute has clear and unambiguous language such as this, the Supreme Court has said that courts should give the statute its plain and ordinary meaning. *Braunstein v. Commissioner*, 374 U.S. 65, 83 S.Ct. 1663, 10 L.Ed.2d 757 (1963); *Labor Relations Board v. Highland Park Mfg. Co.*, 341 U.S. 322, 71 S.Ct. 758, 95 L.Ed. 969 (1951). It is thus improper for a court to rely on Congressional purpose rather than a statute's plain language, or to decide "on a case by case basis, whether a given course of conduct is within the Congressional purpose." *Bren-*

nan v. Taft Broadcasting Company, 500 F.2d 212, 217 (5th Cir. 1974) citing Braunstein, supra. Another reason given by the Fifth Circuit in Brennan for rejecting a statute's asserted purpose when the law is written in plain language is that the "language should serve the function of indicating prohibited conduct. It is hardly reasonable to require persons affected by legislation to delve into voluminous and conflicting collections of speeches to determine whether what that statute plainly says is what it really means." Id. at 217.

■ In light of this case, it would seem that the clear language of the statutory provision would actually draw support from the statute's obvious objective and would thus operate to trigger a cause of action if a sale or transfer is made any time within the applicable twenty year period. See, Corum v. Beth Israel Medical Center, 373 F.Supp. 550 at 556 n. 4 (S.D.N.Y.1974). This conclusion seems compelled by the statute's clear meaning and purpose, which is to keep the funded hospitals non-profit for at least twenty years. Thus a cause of action may be barred by the six-year period of § 2415, but that would not necessarily preclude the government from suing on the basis of a subsequent "sale" or "transfer", if it takes place within the 20-year period of 42 U.S.C. § 291; and it is an outright "sale" or "transfer".

The key question thus becomes: was the corporate activity resulting in the execution of the December 11, 1970 deed a sale or transfer within the meaning of 42 U.S.C. § 291i. The transaction evidenced by the October 2, 1970 deed will not be considered by the court because even if it were to find that a "transfer" or "sale" occurred, the government's cause of action would be barred for the same reasons as the March 17, 1970 transaction.

■ It is a basic principle of corporation law that mergers and consolidations differ from the sale of a corporation or a transfer of its assets. See generally, 19 Am.Jur.2d, Corporations § 1493. In a sale or transfer, the purchaser or transferee of the corporate assets is usually not liable for the debts and obligations of the seller or transferor corporation. Ladjevardian v. Laidlaw-Coggeshall, Inc., 431 F.Supp. 834 (S.D.N.Y.1977). However in the case of a merger or consolidation, a succeeding or surviving corporation is liable for the debts of its predecessors. Ladjevardian, supra at 838–839; Cortland Specialty Co. v. Commissioner of Internal Revenue, 60 F.2d 937 (2d Cir. 1932). Thus in the latter situation, any interest of "stockholders and creditors of any [disappearing] company remain and are retained against the surviving or newly created company." Id. at 939. In Florida, it is made clear by statute that the effect of a merger will be to hold the survivor liable for all liabilities and obligations of each corporation merged. Fla.Stat. § 607.-231(3)(e).

■ Once these distinctions in the effects of corporate changes are ascertained and considered in light of the language of 42 U.S.C. § 291i, it becomes apparent that a new cause of action is triggered only if there is an outright sale or transfer of corporate assets. In such a situation, this court's prior holding in Brady would apply and give rise to a new cause of action in favor of the government and against the subsequent transferors/transferees. The government would then have a right to sue for recoupment after any sale or transfer within the twenty-year period, even if an earlier one had taken place more than six years prior. This holding is based on the statute's plain language, and is supported by Congress' purposeful inclusion of the twenty-year time bracket which limits the period of potential liability.

■ In the situation before this court, however, there was not an outright sale or transfer. There was a merger agreement accompanied by an exchange of stock, and by the express assumption by the survivor of all liabilities and obligations of the transferor, Palm Beach Gardens Community Hospital Corp., which appear on the transferor balance sheet or are referred to in the notes thereof. In the Notes To Financial Statements dated August 31, 1970, it is

expressly provided that the $400,000 grant, as the object of a possible chose in action in favor of the government, is to be recorded as a charge to property. It is clearly contemplated as a potential liability.

Thus any liabilities arising out of the transfer from the City to UAMS, Inc. or the transfer from UAMS, Inc. to Palm Beach Gardens Community Hospital Corp. were expressly assumed by the merger survivor, P.B.G.C.H., Inc. The Government's cause of action based on the original breach of the grant's statutory conditions was preserved against the surviving corporation; a new one was not triggered by the merger. Consequently, when the six-year period of 28 U.S.C. § 2415 expired, so did the government's original and only cause of action, which existed at the time the complaint was filed.

An additional argument raised by the government at trial is that defendants should not be allowed to take advantage of the statute and reap the benefits of a $400,000 windfall. If the limitations statute applies, the court must give heed to it and order the cause of action barred. Statutes of limitations are passed in order to assure the prompt disposition of legal claims, to punish neglect, and to prevent fraudulent or stale claims. The fact that a barred claim is a meritorious or just one, will not save it from the statute. A court cannot purposefully overlook it because the statute would operate to bar a meritorious claim. *See generally,* 51 *Am.Jur.* 2d, *Limitations of Actions,* §§ 17–19.

Accordingly, the court concludes that the first transaction evidenced by the March 16, 1970 deed was barred by 28 U.S.C. § 2415. For similar reasons the court also concludes that the transfer, evidenced by the October 2, 1970 deed, if indeed it was a transfer within the meaning of 42 U.S.C. 291i, is also barred. Finally, the court notes the long-standing distinctions between corporate sales, transfers, mergers and consolidations, *see Cortland, supra* at 939, and concludes that the transaction signified by the December 11, 1970 deed was the culmination of a merger agreement, not a "sale" or "transfer", and that a new cause of action did not arise in the government's favor.

For the reasons set forth above, it is hereby

ORDERED AND ADJUDGED that the government's cause of action against these defendants is barred by 28 U.S.C. § 2415. It is

FURTHER ORDERED AND ADJUDGED that judgment be hereby entered in favor of defendants.

DONE AND ORDERED this 17 day of January, 1979.