**Ralph Van Norman, Plaintiff-Appellee, v. The Peoria Journal-Star, Inc., a Corporation, Defendant-Appellant.**

**Gen. No. 11,483.**

Second District, First Division.

May 6, 1961.

Rehearing denied July 27, 1961, and opinion modified.

315

McConnell, Kennedy, McConnell & Morris, and Younge, Frederick & Rutherford, of Peoria, for appellant.

Kellstedt & Young, of Peoria, for appellee.

DOVE, J.

Ralph Van Norman, the plaintiff in this action was a member of the council of the City of Peoria and present at a meeting of that body held in the council chamber in the city hall on the evening of March 6,

■■■■■■

1951. At that meeting there was a discussion with reference to one-way streets in Peoria in which Mr. Van Norman and Zack O. Monroe, another member of the council participated. The following morning, March 7, 1951, Mr. Van Norman was in the lobby of the main floor of the city hall talking to some friends when Mr. Monroe entered the lobby and shortly thereafter Mr. Van Norman approached Mr. Monroe and they engaged in conversation about something which occurred the previous evening at the council meeting.

More than six years later the Mayor of Peoria referred to this incident in an address delivered by him on March 15, 1957. On March 16 and on March 18, 1957 the Peoria Journal-Star published a portion of this address by the Mayor. The instant action for libel was brought by Mr. Van Norman against Peoria Journal-Star Inc. and is grounded on the publication of this address.

On April 2, 1957 Van Norman filed in the circuit court of Peoria County his three count complaint which was subsequently amended. Each count, as amended alleged among other things that on March 16, 1957 and prior thereto, plaintiff was held in high esteem as a law abiding and law respecting citizen by his neighbors and acquaintances and was a person of good name, credit and reputation and had received the nomination as a candidate for the office of city councilman of Peoria at the city election which was to be held on April 2, 1957. Each count then charged that defendant maliciously composed, printed and published the following false defamatory matter and statement of alleged fact of and concerning the plaintiff:

"Morgan also commented on the recent Trades and Labor Assembly endorsement of Buchanan for Mayor and Myrna Harms, William Kumpf, James Barden and Ralph Van Norman for councilman.

319

Morgan also characterized Van Norman as 'a man who came to city hall in a drunken condition carrying a gun that had to be taken away from him before he hurt somebody' ".

It was then averred that by the malicious publication of the foregoing matter defendant intended to and did damage and injure the reputation, good name and credit of the plaintiff and exposed the plaintiff to public hatred, ridicule and contempt. Each count demanded judgment for both compensatory and punitive damages. Count one was directed to the publication of the article in the morning edition, of the Peoria Journal Star on March 16, 1957. The second count was directed to the publication in the evening edition on March 16, 1957 and the third count was directed to the publication in the evening edition of March 18, 1957.

The answer of the defendant, as amended, admitted that defendant was a corporation and engaged in publishing the morning and evening editions of the Peoria Journal-Star and admitted that plaintiff had received the nomination as a candidate for the office of city councilman. The answer denied every other allegation of the complaint except the allegations with reference to the good name, credit and reputation of the plaintiff prior to the publication of the articles complained of, and as to those allegations the answer, as amended, stated that defendant was not advised of the truth or lack of truth thereof and demanded strict proof.

As an affirmative defense defendant averred that plaintiff was a candidate for the office of city councilman in the election to be held on April 2, 1957; that the matters published by the defendant of and concerning the plaintiff were a true report of the remarks of Mayor Morgan at a public meeting on matters of public interest concerning a candidate for public office and concluded that such matters were fair com-

320

ment and criticism and privileged having arisen out of an incident which occurred on February 7, 1951 wherein plaintiff pointed a gun at Zack O. Monroe in the city hall lobby and threatened to take his life.

A reply traversing the allegations of the affirmative defense was filed and the issues made by the pleadings were submitted to a jury resulting in a verdict finding the defendant guilty and assessing compensatory damages to the plaintiff in the sum of $5,-000.00 and awarding punitive damages to the plaintiff in the sum of $15,000.00. The post-trial motion of the defendant was denied and from the judgment rendered on the verdict defendant appeals.

The record discloses that the article published by the defendant first appeared in the morning edition of the Journal-Star on Saturday, March 16, 1957. It was a featured front page story with a banner headline which read: "Mayor Blasts 'Bad B's': Buchanan, Boswell, Beitz". The article disclosed that it was written by William J. O'Connell and began by stating that Mayor Robert D. Morgan delivered an address to the Friendship Club of Westminister Presbyterian Church Friday night in which he declared in a stinging denunciation of confusing and dirty politics, that Messrs. Beitz, Buchanan and Boswell were behind a conscious and deliberate move to deliver the city government of Peoria over to the racketeers for their own personal gain. The article was several newspaper columns in length and after devoting a paragraph or more to the various candidates for municipal office the article said: "Morgan also characterized Van Norman as 'a man who came to city hall in a drunken condition carrying a gun that had to be taken away from him before he hurt somebody'. He referred to an incident in 1952 when Van Norman was charged with assault with a deadly weapon by Alderman Zack O. Monroe after an altercation on the first floor of the city hall. The charges were later dropped

321

after Van Norman, who maintained it was a 'joke', apologized to Monroe".

As to just what occurred on the morning of March 7, 1951 in the lobby of the city hall, the evidence in this record is, in a few particulars, conflicting. All the evidence is that Van Norman and Monroe had known each other for many years and had been neighbors and friends; that on March 6, 1951 they had attended a meeting of the city council, of which they were both members and had participated in a discussion about one-way streets; that they met the following morning in the lobby of the city hall not far from the cigar stand and engaged in conversation in reference to the proceedings of the council the evening before. Mr. Van Norman was an employee of the Secretary of State and frequently wore a uniform and carried a gun in a holster. According to Mr. Monroe's testimony, Van Norman, on the morning of March 7, 1951, wore a drab gray uniform and had a wide strap over his shoulder with a holster attached in which was a gun which hung on the left side of his body. According to the testimony of Mr. Monroe, Mr. Van Norman during the course of their conversation, became angry and in a loud voice said to him; "I otta blow your . . . brains out" and at the same time pressed the holster of his gun against Monroe's stomach. Mr. Monroe further testified that he did not smell any drink on Van Norman on this occasion and that no one took any gun away from him and he recalled that Captain Edward J. Levin was standing near the cigar stand during the time he and Van Norman were talking.

Mr. Van Norman testified that upon this occasion, he was not in uniform but was dressed in a blue suit over which was a top coat and in the left hand pocket of his top coat was his gun in a holster; that he had his hand in the left pocket of his top coat, had a hold of the holster with his left hand and moved it while

322

talking to Monroe. He further testified that he did not speak in a loud voice and was not angry; that he jokingly said to Monroe: "I otta make you a new hole for your brains, Zack, anyone that would do a dumb stunt like that", referring, he said, to what took place at the council meeting the previous evening.

Captain Edward J. Levin testified that in 1951 he was a captain of police in charge of traffic and was in the lobby of the city hall on the morning of March 7, 1951 at the concession stand buying a package of cigarettes; that he knew and was a friend of both Monroe and Van Norman and observed that both of them were in the lobby and engaged in conversation; that they were about six or seven feet from where he was standing. He further testified that he did not hear what was said by either; that their talk was not loud and he heard no threats made by anyone; that Mr. Van Norman was sober and he recalled seeing Mr. Monroe go up stairs as he left the concession stand and went back to his office.

Louis Davis testified that he was a police officer in 1951 and was in the lobby of the city hall on the morning of March 7, 1951, observed and talked to plaintiff and in his opinion the plaintiff was not intoxicated.

Michael Shore testified that he was State's Attorney in 1951 and that on March 7, 1951 Mr. Monroe came to him and stated that some angry words had been exchanged between Van Norman and himself and wanted a warrant issued; that a warrant was issued but for what offense the witness did not recall but did remember that the case was not prosecuted and was dismissed.

In addition to publishing Mayor Morgan's address in the morning edition of the Journal-Star on March 16, 1957, defendant also published extracts from it in the evening edition the same day and again in the

323

evening edition on the following Monday, March 18, 1957. In the last publication on the evening of March 18, 1957, this sentence was added: "Van Norman yesterday accused Morgan of 'hitting below the belt' ".

The evidence is that at the time the instant complaint was filed, the plaintiff was an employee of the Caterpillar Tractor Company, lived with his wife and son and had served as a member of the city council of Peoria for fourteen years, that is, from 1937 until 1951. In 1957 he had again received the nomination of his party and was a candidate for Alderman at the municipal election to be held on April 2, 1957. In a news article appearing in the Journal-Star on February 2, 1957, defendant published a character sketch of the plaintiff accompanied by a picture. In heavy black type and as a part of that article it was stated that plaintiff was defeated for re-election in 1951 and that "shortly before the election he was involved in an altercation with Alderman Zack O. Monroe in the city hall lobby". Following the publication of the articles complained of in this proceeding defendant, the day before the election, published an editorial recommending the defeat of the plaintiff "in order to eliminate vice and gambling in Peoria".

The record further discloses that the Journal-Star is the only daily newspaper published in Peoria; that the circulation of its morning edition in March 1957 was 35,000 copies and the circulation of its evening edition was 65,000 copies and that the net worth of defendant on March 31, 1957 was $2,402,993.00.

It further appears that Mayor Morgan's statement in his address to the Friendship Club of the Presbyterian Church to the effect that plaintiff came to the city hall in a drunken condition and carrying a gun, had no factual foundation. William O'Connell the author of this article who reported Mr. Morgan's speech and prepared the article for publication testified that

324

he checked his notes with Mr. Morgan at the conclusion of the address and examined an old newspaper clip file kept in the office of the defendant to determine the date of the incident in the lobby of the city hall and that altho the publication stated the year to be 1952, he was in error as the correct date was 1951. Other than conferring with Mr. Morgan and checking his clip file Mr. O'Connell did nothing to ascertain whether the published statement concerning the plaintiff was true or false. Neither Charles Dancey, editor of the newspaper nor Henry P. Slane, president and publisher of the Journal-Star had any knowledge whether the published article was true or false. The evidence does show, however, that none of the officers, reporters or other personnel of defendant company entertained any personal ill-will or malice toward the plaintiff.

It is insisted by counsel for appellant that the trial court erred, (1) in giving plaintiff's instructions 17, 19 and 27; (2) in refusing to give defendant's instructions 35 and 36; (3) in the admission of incompetent and prejudicial evidence over the objection of defendant and (4) that the verdict on compensatory and punitive damages is excessive and contrary to the weight of the evidence and based on conjecture, speculation, whim, incompetent evidence and erroneous instructions.

Counsel for appellee insist that in the conference on instructions and also in defendant's post-trial motion defendant failed to preserve the objections to instructions which counsel now insist upon; that regardless of this failure, the several instructions objected to are proper instructions; that the refused instructions were improper or covered by other given instructions; that the evidence complained of was either properly admitted or proper objections were not made by coun-

325

sel and that the amount of the verdict is reasonable and justified by the record.

Instructon No. 17 given to the jury at the request of the plaintiff stated: "If the jury believe, from a preponderance of the evidence, that the defendant is guilty of maliciously publishing the libelous words charged in the complaint, you may take into consideration the wealth and pecuniary circumstances of defendant, in estimating the amount of damages; and you in your discretion may give damages by way of punishment to the defendant, proportioned to the circumstances in evidence".

The criticism of this instruction is that it permits the jury to take into consideration the wealth and pecuniary circumstances of the defendant in estimating both compensatory and punitive damages. Counsel insists that it confuses compensatory and punitive damages and authorizes a double recovery based on the wealth and pecuniary circumstances of the defendant.

The record shows that at the conference on instructions when instruction No. 17 was being considered the last clause read "and you, in your discretion may give damages by way of punishment to the defendant, proportioned to the circumstances in evidence as well as for compensation!" Counsel for defendant objected to it stating that it was confusing and misleading; that it uses the word maliciously without any definition; that it uses the words 'proportioned to the circumstances' which in law is not a legal definition of what the jury should take into consideration in awarding punitive damages; that it advises the jury that they may use their discretion in determining what punitive damages would be proportioned to the circumstances; that punitive damages, if any, assessed by the jury, should be commensurate with, among other things, the degree of wrong with which the defendant is guilty, if guilty of any wrong, and that it is

peremptory and does not contain all the elements that should be contained in such an instruction. The court stated the words; "as well as for compensation" would be stricken. Counsel for defendant then stated that the instruction was repetitious and that he objected to it being re-written and requested that he be allowed the opportunity to compare the instruction as re-written which request was granted by the court.

■■■ What this instruction told the jury was that if the jury found from a preponderance of the evidence that defendant was guilty of maliciously publishing the libelous words charged in the complaint, that then, the jury may take into consideration, in estimating the amount of damages, the wealth and pecuniary circumstances of the defendant and may give damages, by way of punishment to defendant, proportioned to the circumstances in evidence. Counsel for defendant concede that the words charged in the complaint are, in law libelous per se. Instruction No. 17 is limited in application to a finding of malicious publication. In actions of libel there are two kinds of malice: Malice in law and malice in fact or express malice. Malice in law, or legal malice, is a presumption of law and dispenses with the proof of malice when words which raise such presumption are shown to have been uttered and does not imply ill will, personal malice, hatred or purpose to injure another. Express malice is malice in fact, as distinguished from implied malice and means a wrongful act done intentionally without just cause or excuse. (33 Am. Jur. Libel and Slander, sec. 111, pp. 113, 114).

■■ ■■ The existence of actual malice may be inferred where a defamatory publication is made without proper cause or excuse, (John vs. Tribune Co., 28 Ill. App. 2d 300, 316, 171 N.E. 2d 432, 441) or from falsity, absence of proper cause or other relative circumstances or it may be deduced from the libel itself, or from the communication of which it forms a part.

327

(Cook vs. East Shore Newspapers, Inc., 327 Ill. App. 559, 590, 64 N.E.2d 751). At the conference on instructions, Instruction No. 17 was not considered applicable to the assessment of compensatory damages. There was no reference to actual or compensatory damages in it. In other instructions the court told the jury that the defamatory words were libelous per se and that the law presumed damage, altho no actual pecuniary loss had, in fact, resulted. Defendant made no objection to these instructions. In view of the other given instructions, the jury could not have been misled by instruction No. 17. (See Hosley vs. Brooks, 20 Ill. 115, 117, 118). In 33 ILP Slander and Libel, sec. 123, p. 434 it is stated that exemplary damages may be awarded on the basis of implied malice where the words published are actionable per se.

■ Actual or compensatory damages were covered by instruction No. 27 tendered by the plaintiff and given by the court and also by instruction No. 34 tendered by the defendant and given by the court. Plaintiff's given instruction No. 27, which is also complained of, is as follows:

"The jury are instructed that if you find from a preponderance of the evidence and under the instructions of the court that the plaintiff is entitled to recover, then the plaintiff is entitled to recover actual or compensatory damages and that actual damages or compensatory damages include general damages such as mental suffering and injury to reputation which the law presumes must actually, proximately, and necessarily result from the publication of the defamatory matter and need not be proved by evidence".

Counsel's objection to this instruction is that it is argumentative and unduly emphasizes the legal presumption of damages and also minimizes defend-

328

ant's evidence in mitigation of damages. The instruction says plaintiff's general damages are presumed and need not be proved by evidence. That is the law and there is nothing in the instruction which tends to minimize defendant's evidence in mitigation of damages.

■ Instruction No. 34 given the jury at the request of the defendant told the jury:

"That the plaintiff in this case is entitled to recover compensatory damages such as will fairly compensate him for the injury he has sustained, if any. Since the court has instructed you that the articles complained of by the plaintiff are libelous per se, the law presumes that some damage has been caused to the plaintiff by the publication of said articles. It therefore becomes your duty under such circumstances, to determine the actual damages sustained by the plaintiff, if any, by consideration of all of the evidence with respect thereto, and if you find from the greater weight of all of the evidence that the plaintiff has sustained no actual damages, then your verdict for compensatory damages for the plaintiff should be in the amount of one dollar".

In 33 ILP Slander and Libel, sec. 122, p. 433 it is said: "The law recognizes two classes of damages in actions for defamation, general and special. Special damages are such as are computable in money. General damages are those which the law presumes must actually, proximately and necessarily result from publication of the defamatory matter. They arise by inference of law and are not required to be proved by evidence and are allowable whenever the immediate tendency of the words is to impair plaintiff's reputation, although no actual pecuniary loss has, in fact resulted. . . . Where the words published are ac-

tionable per se, the mental suffering or anguish occasioned by the publication of the defamatory words may be taken into consideration". In support of this text, White vs. Bourquin, 204 Ill. App. 83; Cook vs. East Shore Newspapers, 327 Ill. App. 559, 64 N.E. 2d 751 and Moore vs. Maxey, 152 Ill. App. 647 are cited.

In Moore vs. Maxey, 152 Ill. App. 647 the slanderous words charged the plaintiff with larceny. The court, in the course of its opinion, in commenting upon an instruction which was given in that case which told the jury that mental suffering, if proven, was a proper element of damage said that where words spoken are actionable per se the mental suffering produced thereby is a proper element to be considered in fixing the amount of damages; that there need be no direct evidence of mental suffering to enable the jury to consider it in their estimate of damages but that it may be inferred from the nature of the injury, and that juries may, from their knowledge and experience of human nature, estimate damages which may result from mental anguish and suffering occasioned by a baseless charge of crime, without direct evidence, although it would be permissible to prove such suffering.

■ Instruction No. 19 told the jury "that you may take into consideration the evidence, if any, of failure to make proper investigation, ill will, repetition of the libel, mode and extent of publication, and falsity as tending to show actual or express malice". The objection to this instruction is that it improperly uses the word "ill-will" and also the phrases "extent of publication" and "a proper investigation" and leaves to the jury too wide a latitude to conjecture whether the evidence shows actual malice. The criticism of the use of the words "ill-will" and "extent of publication" was not made at the conference on instructions. In Cook vs. East Shore Newspapers, Inc. 327

330

Ill. App. 559, 64 N.E.2d 751, it is said: (p. 590) "The existence of malice may be inferred. Actual malice may be inferred from falsity, absence of proper cause, or other relative circumstances, or it may be deduced from the libel itself, or from the communication of which it forms a part. All circumstances surrounding the transaction are proper for consideration, including the failure to make a proper investigation." In the instant case the defamatory article was admittedly false and there is evidence in the record of the other enumerated items which this instruction told the jury they were authorized to take into consideration in determining whether defendant was actuated by express malice. There is no merit in defendant's objection to this instruction.

At the request of defendant the words actual malice; fair comment and criticism; and qualifiedly privileged, as used in the instructions, were defined by the court in other given instructions. The court also cautioned the jury to look solely to the evidence for the facts; to the instructions of the court for the law of the case; to give no consideration to any matters not in evidence; to consider all the instructions as one connected series and that the jury should take into consideration that plaintiff was a candidate for public office and an object of fair comment and criticism. On behalf of the plaintiff the court gave six instructions and seventeen on behalf of the defendant. The record discloses that an entire day was devoted by court and counsel in their conference on instructions and indicates that the court was patient, painstaking and considerate of counsel not only during the conference on instructions but throughout the trial.

 Refused Instruction No. 35 told the jury that "punitive damages, as the name indicates, are designed to punish the defendant. They may be awarded only in the event the jury is convinced, by a fair pre-

331

ponderance of the evidence, that the defendant in this case, in publishing the matters complained of, was motivated by personal ill will, actual intent to do the plaintiff harm, or that the defendant was guilty of a wanton disregard of plaintiff's rights in making said publication". The other instruction No. 36, tendered by the defendant and refused by the court, of which action by the court, the defendant complains, told the jury "that mere negligence or carelessness alone is not proof of actual malice and does not justify an award of punitive damages". It was not error to refuse either of those instructions. Instruction No. 36 was an abstract statement and all that was proper in instruction No. 35 was fully covered by other given instructions. The use of the words "convinced" and "fair", referring to the preponderance of the evidence, was improper. (Teter v. Spooner 305 Ill. 198, 210, 211, 137 N.E. 129.)

■■■ It is also insisted by appellant that the court erred in permitting plaintiff's wife and son to testify about the effect the publication of the article complained of had on the plaintiff. The record discloses that counsel for plaintiff asked Mrs. Van Norman what she observed, if anything, "about your husband as to the effect that these articles had on him?" Counsel for defendant objected on the ground that the question called for a conclusion of the witness. The objection was overruled and the witness answered: "I observed he was very, very, deeply hurt. He was worried. He was sick at heart at what this thing would do to his family, do to his son, our boy, that was trying to grow up to be a fine decent citizen and was going to school at Bradley". Counsel for defendant said: "I object, the answer is going beyond the scope of the question". The court: "It will be sustained". Counsel for defendant then said: "I want to ask the court to strike those portions of this witness' testi-

mony which went beyond the scope of the question and instruct the jury to disregard it". The court then inquired of counsel: "What is the part you suggest goes beyond the scope of the question?" Counsel for defendant replied: "Items of relations and so forth are not proper elements of damage". The court: "As to those items pertaining to the witness and the son the answer is stricken". Counsel for plaintiff then inquired of the witness what she observed with reference to his sleeping after the publication of these articles. Over counsel's objection on the ground that it was not a proper element of damage, the witness answered; "He was worried he couldn't sleep, he didn't eat". The court struck the portion of the answer that he was worried and didn't eat and instructed the jury to disregard the same.

■ Over the objection of counsel for defendant the son of the plaintiff was permitted to testify, in answer to a question as to what he observed about his father's conduct after he read the articles complained of, that his father "tended to be more nervous than he was and didn't seem to sleep as well; that he could hear him up at night every once in a while, he would be sitting in the front room smoking a pipe. He seemed to look a little paler and more shaky".

It is also insisted by counsel for defendant that it was error to permit the wife of the plaintiff to testify about a telephone conversation she had with Zack Monroe. What the record shows is that Zack Monroe was a witness called by defendant and upon his cross examination he was asked if he did not "tell Mrs. Van Norman that he was sorry about the published article and wished the plaintiff would quit publishing it and that it was not true?" Mr. Monroe answered that when Mrs. Van Norman talked to him the morning after the thing happened he told her he "was sorry it was published again and I would be glad

333

when everybody forgot about it. I did not tell her that I was sorry because it was untrue and was embarrassing to me as it was to them. I deny making that statement".

In rebuttal Mrs. Van Norman testified that she recalled this conversation with Mr. Monroe and was then asked: "Did Mr. Monroe say to you, in the course of this telephone conversation, that the Journal knew this charge against your husband which was printed in the moring paper wasn't true and he was sorry about it and he wished they would quit printing it". Without objection she answered: "Yes, and he said he wished it hadn't been printed". Counsel for defendant then said: "If the court please" and was interrupted by a question of counsel for plaintiff: "Did he say that to you?" The witness answered: "Yes". Counsel for defendant then said: "Just a minute. I wish to make an objection to the answer as not being responsive and ask that it be stricken". The court then said: "The answer 'yes' will stand. The other answer will be stricken" and in reply to counsel's question: "What part of it?" The court replied: "All of it". The record discloses that Mrs. Van Norman's evidence in this respect was at variance with the testimony of Mr. Monroe. Impeaching evidence cannot relate to collateral issues but from an examination of the entire record in this case we are satisfied that the court did not err in its rulings upon the admission or rejection of evidence and that defendant was not prejudiced thereby.

 It is finally argued that this record is barren of any evidence which would support an award of substantial compensatory damages and that the verdict of the jury on punitive damages is based upon conjecture and speculation and is manifestly excessive. In their argument counsel state that they are

334

aware of the fact that in an action for libel it is no defense to repeat a libel made by another but insist that the fact that defendant did not make the charge is entitled to consideration upon the issue of actual malice. It is also insisted that the evidence shows that there is no ill will or animosity between the plaintiff and defendant; that the libel was published by defendant during the heat and controversy of a political campaign and that the defendant published plaintiff's reply to the Mayor and therefore fairly reported both sides of the political controversy. It is also argued that the imposition of punitive damages in this case will impede rather than promote the public welfare and cannot help but have an inhibiting and stultifying effect upon the vigorous exercise of the freedom of the press. Counsel conclude that if a newspaper may report a campaign of this nature only at the peril of having a jury assess substantial penalties upon the publisher, then the people will not obtain information of a controversial nature, but only pious platitudes.

■■ ■■ In actions for libel the defendant may deny that he published the alleged libelous words or may rely upon the truth of the words published as a defense to the action. If the defendant denies that he published the words declared upon, the defendant may mitigate damages in two ways, first by showing the general bad character of the plaintiff and second by proving any facts which tend to disprove malice but under a denial that he published the words he cannot prove the words declared on to be true. The rule is well settled that where the words published are clearly defamatory and are unambiguous and incapable of an innocent meaning, the court may, as a matter of law, declare to the jury that they are libelous, leaving it to the jury to say whether the publication was made,

with what intent it was made, and whether the published words were true or false. (Dowie vs. Priddle, 216 Ill. 553, 555, 558, 75 N.E. 243).

 Fair and reasonable comment and criticism upon the acts of public officials are of public concern and allowable and should be encouraged. A false statement of fact however, concerning anyone is published only at one's peril. "It is one thing to comment upon or criticise, even with severity, the acknowledged or proved acts of a public man, and quite another to assert that he has been guilty of particular acts of misconduct." (Quoted in Cooper vs. Lawrence, 204 Ill App. 261, 266, 267; See also Belt vs. Tribune Co. 6 Ill. App.2d 489, 128 N.E. 2d 638, 640).

 General damages and injury are presumed to flow from the instant publication. There is no standard by which such damage can be measured but among the elements and circumstances to be considered by the jury are the wide publicity given the defamatory publication, plaintiff's prominence in the community where he lives, his reputation, his injured feelings and mental suffering and anguish.

 The amount of damages in a case of this character is left, under our system of jurisprudence, to the jury and this court should not disturb its conclusion on the ground of excessiveness unless it appears the jury was motivated by prejudice or passion. (O'Malley vs. Ill. Publishing and Printing Co., 194 Ill. App. 544, 557.)

We are unable to find any reversible error in this record. The judgment of the circuit court of Peoria County is therefore affirmed.

Judgment affirmed.

SMITH, P. J. and McNEAL, J., concur.