HAROLD G. BLOOMFIELD, Plaintiff-Appellee, Cross-Appellant, *v.* RETAIL CREDIT COMPANY, Defendant-Appellant, Cross-Appellee.

(No. 55319;

First District (5th Division)—August 3, 1973.

Peterson, Ross, Rall, Barber & Seidel, of Chicago, (A. R. Peterson and John W. McCullough, of counsel,) for appellant.

George A. Beck and Gerard C. Heldrich, Jr., of Peterson, Bogucki & Beck, and Sidney Z. Karasik, all of Chicago, (Ellis B. Rosenzweig, of counsel,) for appellee.

Mr. JUSTICE ENGLISH delivered the opinion of the court:

This action for libel is based upon investigative reports which defendant, a credit reporting service, supplied to one of its subscribers about plaintiff. Plaintiff filed a five-count complaint, two of which charged libel, while the others charged interference with a contractual relationship, invasion of privacy, and violation of the statute covering the licensing of

private detectives. The latter two counts were dismissed on defendant's motion, and the case was submitted to the jury on the remaining three counts. The jury returned a verdict finding defendant guilty and assessing $500,000 compensatory damages and $100,000 punitive damages. This appeal is taken from the judgment entered on those verdicts. In addition, plaintiff has cross appealed from the dismissal of the two counts of the complaint previously referred to.

Defendant presents the following contentions on review:

1. The jury was erroneously instructed.

2. The damages awarded are excessive and not supported by the evidence.

3. Defendant was denied a fair trial by misconduct of plaintiff's counsel.

4. The court erred in the admission and exclusion of certain testimony.

5. The court erred in ruling defendant's reports libelous per se and in submitting the case to the jury on that theory.

6. The court erred in submitting the case to the jury on the theory that defendant's reports were libelous *per quod* because plaintiff did not prove actual damages resulting from the reports.

7. The court erred in submitting the issue of contractual interference to the jury.

8. The jury's finding of actual malice on a special interrogatory was contrary to the manifest weight of the evidence.

On September 3, 1964, Puritan Life Insurance Company (Puritan) requested from defendant an investigative report on plaintiff whom Puritan was considering for an insurance agent's position. A report dated September 16, 1964, was prepared by James Aubry, an employee of defendant, and sent to Puritan. The following has been taken verbatim (including typographical errors, etc.) from the report:

> "Is there anything about his appearance, temperament, or personal characteristics that might affect his ability as an agent? Yes. Does he now, or has he in the past, used beer, wine, or whiskey to noticeable excess or intoxication? Yes.
>
> This report is the result of investigation by the Chicago office at a former emp oyer and by our Morton Grove office at the present residence.
>
> Harold G Bloomfield was last employed by Albert Knapp & Associates. This is a large broker employing about 15 persons. Subject was an assistant to the president. It was his job to travel about the country contacting various brokers, trying to interest them in selling schools an accident insurance policy covering chil-

dren. His work was considered average, subject was temperamental, he showed his dislikes, ifhe disliked a potential customer, he did not bother to sell him with the same care that he executed on brokers to whom he took a liking. Subject was under contract earning 18,000 plus expenses. He was obligated to entertain brokers, and had been criticized for exc ssive drinking on various occassions. This was limited as subject had an ulcer condition. He, in additional to ulcers, had some type of spinal disorder, which doctors wnated subject to have corrected by surgery. He would not submit to surgery, and he is subject to attacks during meals, which have the appearance of heart attacks, and have alarmed customers who are dining with him. He eats lightly.

He is married for a second time, and lives with his wife and two children in his own home located in a middle class area. The house is * * * presently up for sale. He has a grown son by his first marriage, this son was in trouble with the Navy in the past, has left the navy and is now in the merchant marine.

Confirmation. Information supplied by a close confidential source. Confirmed by a former business associate."

On September 23, 1964, Puritan requested more detailed information concerning plaintiff. The report that defendant provided, dated September 28, 1964, was prepared by its employee George Gallos and covered the previous five years of plaintiff's background, whereas the prior report went back only two years. That report included the following (also verbatim):

"How Often Intoxicants Used?        Daily.

How Many Drinks Taken?        5—6

Are Intoxicants Used to Excess or Were They in Past?
    Yes—see habits.

Reputation Good? No

Recommended? No—sub to health habits.

NOTE; Supplamenting our report of 9—16—64 on subject and in answer to your letter of 9—23—64 we have completed another investigation with alternate inspector handling this case. We are sending a narrative report as you indicated we do so.

EDUCATION; Subject is stated to have a better then average educational background and to know the insurance business very well. No college work known for the subject.

EMPLOYMENT RECORD; We learn that the applicant was em-

ployed with the Albert Knapp & Associates, 4555 N. Broadway Ave. Chicago Ill. a brokerage firm employing over 15 persons and engaged in selling insurance to schools and educational instititutions. Subject was employed as a recruiter of agents and brokers to selling insurance lines that this firm represents.H was paid $18,000 a year plus fringe benefits for this job.However we learn he was terminated by mutual consent when he was not doing the job.He was out ill for great lengths of time and also stated at times to drink to excess and not apply himself to job. He was not soliciting sufficient business to pay for his expenses and salary.

Prior to this he was employed with the Higham-Nielson-Whitridge & Reid, a firm which was amalgamated with the Brown & Hawley Co. 175 W. Jackson, large insurance brokerage firm.He was with them for 3 yrs as branch manager of firm in Chicago Ill. Subject left this firm for better job with Albert Knapp & Associates.He was known to have an ulcer here but not other criticicms known.He was paid $15,000 a year at this job.

FINANCES;He has a good financial standing as hepays obligations when due and in full.No past suits or judgements known for the subject.His worth is estimated from personal belongings, equity in home,and home furnishings and savings.Income at $18,000 from last employer.

TRAITS;Subject w s stated to be tempermental in dealings with others.He at times was not patient with persons he was trying to solicit business with.He was disliked by many because of his forcefull personality and also his tempermental outbursts.He always complained about his health also and nursed himself to point where he lost much time from work,which at times employer felt was not justified.

ACTIVITIES;No unusual hobbies or activities known forthe subject.Not known to belong to any clubs or associations. Would spend most of his spare time at home with his family.

HEALTH HABITS.Subject has been known to have an ulcer condition at least for the last 5 yrs and to take much time off from work because of this condition.Also he at times has trouble breathing and will have to excuse himself and go to wash room for medication for this condition. Also stated to have a spinal condition, but details concerning this was not certain.He will drink frequently and at times onpoint where he becomes loud and

abusive,but always has managed to have control of his faculties. He has been drinking for the last 2 years to this extent and was one reason he was released by last employer.

PERSONAL.He is married for the second time.he is known to live withhis second wife and a 3 yrs old sonand 3 months old girl in a home he owned in suburban Glenview,but which is currently for sale.Present wifes name is Bernadette.He also has a 20 yrs old son in the merchant marine from his first marriage.Has lived at t e present address for the time known.

INFORMANTS:  1.A former employer.  3.A former employer.
2.A former employer.  4.A former employer.
5.File information on subject."

On October 6, 1964, Mr. Frazier S. Wilson, plaintiff's friend and an officer of another company which also subscribed to defendant's reports, asked defendant for a report concerning plaintiff. When he was given the September 28, 1964, report, he contacted plaintiff about the reported material. At the time he requested the report, neither Mr. Wilson nor his company had any thought of employing plaintiff.

After learning the contents of the report from Mr. Wilson, plaintiff met with a supervisor of defendant and asked that a new report eliminating the alleged libelous material be prepared and submitted to Puritan. As a result of that meeting, defendant prepared a third report dated October 23, 1964, which changed much of the information which had been previously supplied by plaintiff's last prior immediate superior who, defendant learned, would become plaintiff's business competitor if plaintiff became Puritan's agent. As example, the third report included the following:

"How Often Intoxicants Used?  weekly
How Many Drinks Taken?  moderate
Are Intoxicants Used to
  Excess or Were They in
  the Past?  No.
Reputation Good?  Yes.
Recommended?  Yes.
  *   *   *

He is known to have resigned from this position (with Albert Knapp & Associates) due to a disagreement with the owner of this firm in regards to handling of agents etc. We are unable to secure more definite information on this resignation due to the

fact that the differences between these men were a matter of personal thoughts toward proper methods of operation.

&ast; &ast; &ast;

He is a moderate social drinker taking an occasional mixed drink when entertaining clientel etc., however, not known to drink to excess."

Paraphrasing some of the rest of the long report, it stated that while he had left his second prior employment (Benefit Trust Life) by mutual agreement over differences as to operations of the agency, it also stated that "his production was not satisfactory" and "He is not eligible for rehire." The report also referred to his having had a herniated disc and an ulcer in about 1961, and has been somewhat bothered with gout. Although this report in its basic features is seen to be startlingly different from the prior ones in its aspects favorable to plaintiff, he still complains that it falsely accused him of unsatisfactory production, not being eligible for rehire, and of suffering from gout.

Negotiations between plaintiff and Puritan continued until November, 1964. Prior to that, a general managing agent position was discussed, but no agreements were ever signed. Plaintiff expected to sell $1,000,000 of insurance a year, on the premiums for which he would have received a commission of 7½%. He testified that when he asked Mr. Ross, President of Puritan, in a phone conversation, whether the reports had any effect on the pending negotiations, Ross had replied that they had.

Defendant's investigators were trained by sending them into the field with more experienced investigators. Each investigator was provided with an Inspector Manual which was quite lengthy and included the following relevant passages:

"*Libel:* Libel is the written defamation of a person without legal justification.

After the investigation is completed the inspector should recognize his obligation to write the report fairly and accurately. If a statement is to be included in a report that would detract from the subject's fame or reputation it should be factual and fully confirmed.

*Malice:* It is not likely that any of our inspectors would have any personal malice against the person reported on; however, it is necessary to detect when an informant is prejudiced against the subject, and to confirm such information through an authoritative and unbiased source.

In writing up your report bear in mind that there are two types of malice: (1) *malice in fact* which is personal malice; and (2) *malice in law* which could be inferred by a court when the

report reveals carelessness or disregard of facts, or negligence in failing to investigate thoroughly and to confirm properly the information.

Moderate social drinking is not objected to by most employers so long as the worker does not permit his drinking to interfere with regularity in reporting for duty, and does not indulge on the job.

This attitude should not be allowed to affect the inspector, however. Careful investigation of habits should be made in each case, and complete and accurate information on this feature should be given. Any excessive use of intoxicants or drugs should be covered in detail.

This information needs to be confirmed as in any type report. Be careful when a former employer makes vague or casual reference to heavy drinking. Press for details; be sure his knowledge is firsthand and free from prejudice."

In defendant's brief it first complains that over its specific objections the court gave five erroneous instructions to the jury.[1] Defendant main-

---

[1] *Plaintiff's Instruction # 5.*
"The court instructs the Jury that the reports writen by the defendant and published by the defendant, Retail Credit Corporation, were libelous per se in that they are prejudicial to the plaintiff in his business, trade and profession."
*Plaintiff's Instruction # 9.*
"The Court instructs the jury that in an action for libel, the law presumes damage from the publication of matter libelous per se, although no actual pecuniary loss has, in fact, resulted."
*Plaintiff's Instruction # 12.*
"The Court instructs the jury that if you believe from a preponderance of the evidence that the defendant in this case did maliciously libel the plaintiff, prejudicing him in his business, trade or profession, then you should find for the plaintiff and assess such damages as in your sound judgment and discretion will justly compensate the plaintiff for all the damages he suffered by reason and as a proximate consequence of the plaintiff having been so libeled. In assessing such damages you may take into consideration the fact of the libel of the plaintiff and you may consider the injury to fame, reputation, humiliation, embarrassment, ridicule, disgrace, public hatred, contempt and decrease in earning capacity so far as such elements are disclosed by the evidence if any such elements are so disclosed. In addition thereto, you may award such exemplary damages as in your judgment should be given by way of punishment to the defendant and as an example to deter others from offending in a like manner."
*Plaintiff's Instruction # 13.*
"The Court instructs the Jury that you may take into consideration evidence of any failure to make a proper investigation, ill-will, mode and extent of publication and falsity as tending to show actual or express malice."
*Plaintiff's Instruction # 14.*
"The Court instructs the Jury that if they find from the evidence that the defendant is guilty of libel and that the plaintiff has suffered actual damage as a result of the malicious conduct of the defendant, they may assess against the defendant the damages actually suffered. These damages are called compensatory damages."

tains that plaintiff's instruction # 5 misled the jury by failing to specify which of the three reports were libelous per se. Only the reports of September 16 and September 28, 1964, were the subject of plaintiff's complaint, and although the October report was accepted into evidence and was alleged at trial and in plaintiff's brief to continue the libel, we fail to see how the jury could have been seriously misled, to the prejudice of defendant, on the issue of liability, by reference to "the reports" in instruction # 5. Since, at trial, the greatest emphasis by far was on the two September reports which, as we shall explain later, were properly referred to as libelous per se, the only possible effect the inclusion of the October report could have had upon the jury would have related to the award of damages which we also shall discuss later.

Next, defendant asserts that instruction # 9 erroneously stated that the law presumes damage from the publication of material which is libelous per se even when, as here, the publication is qualifiedly privileged.

In *Bartels v. Retail Credit Co.*, 185 Neb. 304, 175 N.W.2d 292, relied upon by defendant, the court discussed the same qualified privilege as exists in the present case, and warned that to maintain the privilege, the "mercantile agency's representatives must act impartially and in good faith, carefully evaluating all information before disseminating any defamatory statements to its subscribers." A thorough and complete investigation is required and it should come only from reliable sources. The court found sufficient evidence "to permit the jury to find that the preparation of the reports indicated a lack of reasonable care and diligence to ascertain the truth, and that they were circulated in a reckless disregard of the rights of the plaintiff" (See 40 A.L.R.3d 1049.) In reversing, however, the court stated that in a case of qualified privilege, damages are not presumed. Rather, we believe, it is correct to say that words which are libelous per se carry three presumptions: a presumption of falsity (which was admitted in the present case), a presumption of damage, and a presumption of malice. (*Lorillard v. Field Enterprises, Inc.*, 65 Ill.App.2d 65, 78, 213 N.E.2d 1; 53 C.J.S., Libel and Slander, sec. 8a, p. 43.) However, publication of a communication which is qualifiedly privileged rebuts the presumption of malice which arises from the defamatory publication (*Adair v. Timblin*, 186 Ill.App. 133), and gives rise, instead, to a presumption of good faith. (See *Young v. Lindstrom*, 115 Ill.App. 239, and *Johns v. Associated Aviation Underwriters*, 203 F.2d 208, 211 (5th Cir. 1953); 53 C.J.S., Libel and Slander, sec. 101, p. 162.) Nevertheless, the presumption of damages is not affected by the existence of a qualified privilege. (See *Van Norman v. Peoria Journal-Star, Inc.*, 31 Ill.App.2d 314, 329, 175 N.E.2d 805.) When one is presumed to

have acted in good faith, a finding of actual or express malice overcomes the presumption of good faith, thereby defeating the qualified privilege on which it is based. See *Jamison v. Rebenson*, 21 Ill.App.2d 364, 369, 158 N.E.2d 82.

Defendant's instruction # 3, which was given to the jury over plaintiff's objection, bears on this subject. After first explaining the existence of defendant's qualified privilege, this instruction directed the jury to find for the defendant "unless you find from the evidence that the defendant published the reports with actual malice toward the plaintiff on the part of the defendant," on which point the court further instructed the jury that the plaintiff had the burden of proof.

In this regard, it should not be overlooked that the jury was given the following special interrogatory:

"Was the defendant guilty of actual malice when it published the reports of September 16, 1964 and September 28, 1964?" The jury's answer was "Yes."

■■ There are two types of malice. Malice which overcomes a qualified privilege is different from that which the law presumes from the unprivileged publication of a false communication. (*Van Norman v. Peoria Journal-Star, Inc.*, 31 Ill.App.2d 314, 327, 175 N.E.2d 805; 53 C.J.S., Libel and Slander, sec. 2, p. 35.) The actual malice which is not presumed but must be proved or inferred from the evidence to overcome a qualified privilege is express malice or malice in fact denoting ill-will, evil motive, intention to injure witthout just cause or excuse, or by a wanton disregard for another's rights. (*Van Norman v. Peoria Journal-Star, Inc.*, 31 Ill.App.2d 314, 327, 175 N.E.2d 805; *Cook v. East Shore Newspapers, Inc.*, 327 Ill.App. 559, 590, 64 N.E.2d 751; *Oberman v. Dun & Bradstreet, Inc.*, 460 F.2d 1381 (7th Cir. 1972); 53 C.J.S., *Libel and Slander*, sec. 100, p. 159.) Ordinary negligence, in itself, is not sufficient proof of express malice. But proof of a wanton disregard of the rights of others is sufficient. *Roemer v. Retail Credit Co.*, 3 Cal.App.3d 368, 83 Cal.Rptr. 540; *A.B.C. Needlecraft Co. v. Dun & Bradstreet, Inc.*, 245 F.2d 775 (2nd Cir. 1957).

■■ We believe instruction # 9 correctly states that damage is presumed from the publication of matter libelous per se, since it is only the presumption of malice and not the presumption of damage which is affected by defendant's qualified privilege. Also, the jury was aided by instruction # 18 which correctly told them that a qualified privilege could be abused "if the publisher does not believe in the truth of the defamatory matter, or has no reasonable grounds for believing it to be true." *Zeinfeld v. Hayes Freight Lines, Inc.*, 41 Ill.2d 345, 350, 243 N.E.2d 217.

Instruction # 12, of which defendant also complains, likewise is proper because it conditions the jury's finding for plaintiff on his proof of actual malice by a preponderance of the evidence, and not, as defendant suggests, on a mere finding of libel.

■■■ Instruction # 13, defendant claims, erroneously stated that the jury could consider "falsity" and "failure to make a proper investigation," *i.e.*, negligence, as "tending to show actual or express malice." However, it was preceded by instruction # 9 which defined malice as "a wrong which is inflicted with an evil intent, design or purpose, and implies that the guilty party was actuated by improper or dishonest motives and intended to perpetrate an injury or wrong on another." Therefore, when read with instruction # 9, instruction #13 was correct in explaining what factors the jury might consider as "tending to show actual or express malice." This was important in light of instruction # 18 which stated the circumstances under which the publisher of a libel might lose his qualified privilege. The jury was *not* instructed that "falsity" or "failure to make a proper investigation" were presumptive of malice, nor do we believe such was the implication of the complained of instruction. If this had been the case, defendant would have been correct in asking for reversal, since, as we have stated, mere negligence may not be equated to the type of wilful or wanton conduct which gives rise to actual malice and thereby destroys a qualified privilege. See *Van Norman v. Peoria Journal-Star, Inc.*, 31 Ill.App.2d 314, 330, 175 N.E.2d 805; see also *Flannery v. Allyn*, 75 Ill.App.2d 365, 373, 221 N.E.2d 89.

Next, defendant argues that the effect of instruction # 5, when read with instruction # 9, is to direct a verdict for plaintiff. Instruction # 5 informed the jury that the reports were libelous per se. Instruction # 9 told the jury that damage was presumed. He states that instruction # 14 summarized for the jury the directed liability theory. However, instruction # 14 requires the jury to find "malicious conduct of the defendant" before actual damages may be assessed. Thus, with the jury still required to find malice in defendant's behavior, there was no required finding of liability, as defendant suggests. With defendant's instruction # 3 stating that "* * * the reports sued upon in this case are qualifiedly privileged communications * * *. You must find for the defendant unless you find from the evidence that the defendant published the reports with actual malice toward the plaintiff on the part of the defendant," the jury was informed that a determination of malice was the prerequisite to defendant's liability for actual damages suffered.

Defendant also complains that the court erred in refusing to give the following instructions tendered by defendant:

*Defendant's Instruction # 5.*

"In the event you find in favor of the plaintiff and that he is entitled to recover compensatory damages such as will fairly compensate him for the damages he has sustained, if any, it therefore would become your duty under such circumstances, to determine the actual damages sustained by him, if any, by consideration of all of the evidence with respect thereto, and if you find from the greater weight of all of the evidence that the plaintiff has sustained no actual damages, then your verdict for compensatory damages for the plaintiff should be in the amount of one dollar."

*Defendant's Instruction # 7.*

"You are instructed that anything done or omitted to be done by the defendant after the commencement of this lawsuit by the plaintiff cannot be considered by you as to whether the defendant was or was not guilty of malice."

*Defendant's Instructions # 8 and 8-A.*

"You are instructed that to refer to a person as an American Hebrew who is of a different ethnic origin does not constitute libel.

To refer to a person as an American Hebrew who is in fact of a different ethnic origin, is not libelous per se."

■■ Defendant's instruction # 5 is quite similar to plaintiff's instruction # 14, referred to earlier, which informed the jury that if liability were established, compensatory damages could only be those which plaintiff actually suffered. The element added by defendant's proposed instruction was the limitation of the award to $1.00 if no actual damage was suffered. We believe the instruction should have been given but bears only on the question of damages which we shall discuss below.

As to defendant's instruction # 7, however, we agree with plaintiff that it would have confused the jury by instructing them not to consider any of defendant's actions after initiation of the suit as tending to indicate malice or the lack of it. Such an instruction might, in fact, have adversely affected defendant's case, since the jury could have considered defendant's refusal to issue additional reports after the corrected October report as evidence of good faith.

Defendant's tendered instructions # 8 and 8-A relate, in our opinion, to a matter of de minimus. While it may well be true that the incorrect identification of plaintiff as a Hebrew American in the first two reports (corrected to "A-S" in the third report), is not libelous per se, on the other hand, since plaintiff was actually of Scottish descent and not Hebrew American, the jury might have considered this misnomer as an example of falsity, or of reckless disregard for the truth of falsity of the

statements contained in the reports. We believe that the giving or refusing of this instruction would have had no bearing on the jury's verdict.
■■ Next, defendant argues that plaintiff failed to prove substantial damages attributable to the allegedly defamatory publications. In so saying, defendant concedes that "Illinois courts hold that compensatory damages may include the mental suffering and injury to reputation, presumed to arise from such a publication, and these elements of damage need not be supported by evidence. *Lorillard v. Field Enterprises, Inc.,* 65 Ill.App.2d 65, 78-79, 213 N.E.2d 1, 7-8." (See *Van Norman v. Peoria Journal-Star, Inc.,* 31 Ill.App.2d 314, 329, 175 N.E.2d 805.) However, defendant argues at length, and we agree, that *substantial* damages are not presumed, and that the evidence of actual damage in this case does not support the compensatory damage award. It is beyond argument that the amount of damages is ordinarily to be left to the jury, and we may not upset their award unless it appears they were motivated by prejudice or passion. (*Van Norman v. Peoria Journal-Star, Inc.,* 31 Ill.App.2d 314, 175 N.E.2d 805.) But defendant contends that there was precisely the kind of evidence improperly admitted on plaintiff's behalf which could reasonably be expected to produce such prejudice.

■■ Defendant asserts that it was seriously prejudiced by plaintiff's testimony regarding purported negotiations with insurance companies other than Puritan, which allegedly fell through because defendant failed to supply a report. These were companies which, by the nature of things, had never seen the alleged libelous reports which form the basis of this litigation. Plaintiff was permitted to testify, over objection, to a conversation he had had with the president of Old Equity Life Insurance Co., Evanston, Illinois. Plaintiff volunteered to him that "he probably could not get a Retail Credit Report on" him; whereupon, he was told, "If I can't get a Retail Credit report on you, we don't do business." Similarly, when plaintiff was permitted to testify, over objection, about negotiations he had in 1966 with Sentry Insurance Company, he appears again to have brought up the specific name of defendant in regard to an unobtainable credit report. In both instances, he left in the minds of the jurors by this hearsay testimony the impression that defendant's failure to issue further reports had continued on, causing him to lose possible contracts and a substantial source of income, and could continue to do so indefinitely in the future. Thus, defendant was placed in the unenviable position of either making further publication, during this pending litigation, of the allegedly libelous material (plaintiff asserts the third report issued to Puritan in October, prior to commencement of this suit, was still libelous per se), and thereby risking increased damages, or not supplying further reports, and then, according to plaintiff, increasing

the damages. Not only were the admitted conversations hearsay and improperly submitted to the jury, but proof of the *failure* to publish libelous material cannot be used as evidence in a libel action to establish additional damages. In logic, plaintiff could have gone through the same routine with 50 insurance companies, with prior certitude of the same result. There is no testimony, for example, that plaintiff asked either of these companies if they would accept a Dun & Bradstreet report, or one from some other credit company, but only Retail Credit, which he knew he could not get. Such evidence as was introduced by plaintiff could not help but be highly prejudicial, since it penalizes defendant for acting in the only reasonable manner then available to it. It should be noted that defendant's reports had been sent to only one potential employer (Puritan) and, after suit was filed, it was only proper for it not to have made any further publications. The effect of this prejudice was to permit the jury to conclude that plaintiff was forever barred from further reasonable employment by defendant's publication to one prospective employer only. The improperly admitted evidence thus ran directly contrary to a plaintiff's obligation to mitigate his damages, and permitted him to go about aggravating them instead. See 50 Am.Jur.2d, Libel and Slander, § 372, pp. 896-897.

Furthermore, in the opening statement to the jury by plaintiff's counsel, he said that Mr. Ross, president of Puritan, would testify that he had refused to hire plaintiff solely because of defendant's reports. Ross was never presented as a witness, and there was some defense evidence indicating that his refusal to hire plaintiff had been due to the pendency of this lawsuit. In any event, counsel's comments on what Ross would say about the very heart of the principal issue in the case, without the production of such evidence, has been held under a similar situation to have been prejudicial and improper. See *Colmar v. Greater Niles Twp. Pub. Co.,* 13 Ill.App.2d 267, 273-274, 141 N.E.2d 652, 655; and *McCarthy v. Spring Vally Coal Co.,* 232 Ill. 473, 83 N.E. 957.

■■ Next, defendant argues that the September reports were neither libelous per se nor per quod, and that the court erred by submitting the case to the jury on Counts I, II and III of the complaint which charged defendant with issuing false reports which interfered with his contractual relations and injured his business. In spite of defendant's cases, which cite numerous instances where material similar to some portions of the September reports were held not to be libelous per se, when taken as a whole, we agree with the trial court that the reports clearly present a situation where plaintiff's business reputation had been injured. The September reports recommended that plaintiff not be hired partly because of poor health and excessive drinking. They said that he was

temperamental and showed his dislikes. "He [was] subject to attacks during meals, which [had] the appearance of heart attacks, and [had] alarmed customers who [were] dining with him." He allegedly drank to excess and did not apply himself to his job. "He was not soliciting sufficient business to pay for his expenses and salary. * * * He was disliked by many * * * because of his temperamental outbursts * * *." These and other elements of the reports, in plain and unambiguous language and without resort to innuendo, clearly had the effect of injuring him in his trade or profession and were properly considered libelous per se. Also, we believe there was sufficient proof of malice, of the possibility that there might otherwise have been a successful termination to plaintiff's contract negotiations with Puritan, and of damages to submit the contractual interference question of Count II to the jury.

Finally, defendant argues that the jury's affirmative response to the special interrogatory concerning actual malice, was contrary to the manifest weight of the evidence; was, in effect, directed by the court's erroneous instructions concerning malice; and should be set aside. We have previously ruled that the instructions concerning malice were proper; thus, we need not consider that portion of defendant's final argument. In arguing that the finding of actual malice was against the manifest weight of the evidence, defendant contends that there was no evidence of spite or hatred shown prior to the issuance of the first two reports. We agree. However, in a case such as this involving a qualified privilege, actual malice may be shown to exist if the privilege is abused by publishing material without a reasonable basis for belief in its truth. (*Zeinfeld v. Hayes Freight Lines, Inc.*, 41 Ill.2d 345, 350, 243 N.E.2d 217.) This is not the negligence standard which we agreed would not support a finding of malice, but, rather, one which suggests a reckless disregard for the truth or falsity of the published material. (See *Dun & Bradstreet, Inc. v. Nicklaus*, 340 F.2d 882 (8th Cir. 1965), *cert. denied* 382 U.S. 825.) In the present case, the jury was told by instruction # 18 that the privilege was subject to abuse and that the standard for determining abuse was as we have stated above. The jury's special finding was adequately supported by the testimony of defendant's own employees. James Aubry received the information for the first report only from plaintiff's former superior, Albert Knapp, with whom plaintiff would be in competition if employed elsewhere. The only corroboration obtained was from Knapp's secretary, not further identified, who allegedly confirmed the information only by stating that she knew there was trouble, but that whatever Mr. Knapp said, was true. No other confirmation of Knapp's damaging remarks was sought either by Aubry or

Gallos who prepared the second report, in spite of instructions in their Inspector's Manual that "[I]f a statement is to be included in a report that would detract from the subject's fame or reputation it should be factual and fully confirmed. * * * [I]t is necessary to detect when an informant is prejudiced against the subject, and to confirm such information through an authoritative and unbiased source." Both investigators certainly knew that Knapp's information was damaging and was, at least, potentially prejudicial, yet each recklessly failed to search for adequate confirmation or other sources. Clearly, their actions led the jury to conclude that the qualified privilege of publication had been abused, thus warranting a finding that defendant had acted without a reasonable belief in the truth of the reports or was motivated by a reckless disregard for the truth of the published material. We conclude that the jury's affirmative answer to the special interrogatory was justified by the evidence.

In his cross appeal, plaintiff argues that the court erred in dismissing Counts IV and V of his complaint.

Count IV charged that defendant was in violation of Ill. Rev. Stat. 1963, ch. 38, par. 608a, *et seq.*,[2] by operating a detective agency without the required certificate of authority, and that neither Aubry nor Gallos, defendant's investigators, was licensed, as required by the Criminal Code. In this civil action, plaintiff sought damages from defendant for conducting interviews without proper authority. We agree with the trial court which dismissed the count for failing to state a cause of action. The Act under which plaintiff seeks recovery is a criminal statute which specifically excludes "any person, firm or corporation whose business is the furnishing of information as to the business and financial standing and credit of persons, firms or corporations; * * *." (Ill. Rev. Stat. 1963, ch. 38, par. 608c.) Thus, defendant has not violated the Criminal Code and plaintiff has suffered no loss as a result of defendant's actions, as alleged under this count.

■■■ Count V, also dismissed for failure to state a cause of action, charged defendant with invasion of privacy by publishing personal data in the reports which had nothing to do with his business. We believe the trial judge ruled correctly when he stated that the right of privacy is not absolute but is subject to limitations where there is express or implied consent and legitimate interests. (*Eick v. Perk Dog Food Co.*, 347 Ill.App. 293, 106 N.E.2d 742.) In the present case, not only was the publication which went only to Puritan and to one of plaintiff's friends,

---

[2] Ill. Rev. Stat. 1963, ch. 38, par. 608a has been transferred to Ill. Rev. Stat., ch. 38, par. 201—1, *et seq.* in current statutes.

far more restricted than in the cases cited by plaintiff (see *Eick v. Perk Dog Food Co.*, 347 Ill.App. 293, 106 N.E.2d 742 and *Leopold v. Levin,* 45 Ill.2d 434, 259 N.E.2d 250), but plaintiff impliedly consented to the publication when he offered the names of former employers as references. He testified that he fully expected the reports to be prepared, and even complained when defendant discontinued publication of reports which he alleged were hurtful to his employment prospects. Also, when a business interest is being served, personality traits and family background are frequently considered legitimate business interests for purposes of hiring. And this is especially true when the business interest is one to which a qualified privilege is attached, in which case the right of privacy must be considered waived within the framework of reasonable and customary credit reporting.

In conclusion, the decision of the trial court dismissing Counts IV and V of the complaint is affirmed. The judgment as to liability on the remaining counts of the complaint is also affirmed, but the judgment as to damages is reversed and the cause is remanded for a new trial on that issue.

Affirmed in part, reversed and remanded in part.

DRUCKER, P. J., and LORENZ, J., concur.